## CUDAHY PACKING CO. v. STATE NAT. BANK OF ST. LOUIS, MO.

(Circuit Court of Appeals, Eighth Circuit. December 24, 1904.)

No. 2,057.

1. MORTGAGE—UNSIGNED MEMORANDUM ON BACK.
      An unsigned contract printed on the back of a mortgage, and not referred to therein, cannot in any way qualify the terms of the mortgage.

2. NEGOTIABLE INSTRUMENTS—ATTORNEY'S FEES.
      A provision for the payment of attorney's fees in case a note is not paid at maturity does not destroy the negotiability of a note otherwise negotiable.
      [Ed. Note.—For cases in point, see vol. 7, Cent. Dig. Bills and Notes, § 403.]

3. SAME—CERTAINTY REQUIRED IN NEGOTIABLE PAPER.
      The certainty required in commercial paper is commercial certainty, not mathematical. The courts ought not to hold any provision fatal to the negotiability of such paper which by the general usage of the business world does not have that effect.

4. MORTGAGE—NEGOTIABLE INSTRUMENTS.
      A mortgage securing a negotiable note so far partakes of its character as to pass free from equities between the original parties to a bona fide indorsee of the note.

5. SAME—SECURING NONNEGOTIABLE DEBT.
      Quære: Whether the mortgagor of a mortgage securing a nonnegotiable debt can, after an assignment of the mortgage, by any dealings with the mortgagee short of actual payment, though had in ignorance of the assignment, raise "an equity" as against the assignee.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Western District of Missouri.

For opinion below, see 126 Fed. 543.

Edwin A. Krauthoff (Thomas Creagh, J. V. C. Karnes, and Alexander New, on the brief), for plaintiff in error.

C. H. Kohler (M. A. Fyke, E. L. Snider, and J. H. Richardson, on the brief), for defendant in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge.   June 5, 1901, Humphrey & Fleming executed and delivered to Tamblyn & Tamblyn, live stock agents and brokers, of Kansas City, Mo., their promissory note for $7,000, payable December 1st of that year, with interest at 8 per cent.   To secure the payment of this note the. makers executed a chattel mortgage of even date upon 300 head of four and five year old steers, which mortgage was duly filed in the proper office June 8th following.   June 10th Tamblyn & Tamblyn, for value, indorsed and transferred the note and assigned the mortgage to the defendant in error (the plaintiff below), the State National Bank of St. Louis, Mo.   The assignment was not recorded, and was not required to be by law, and no actual notice of the transfer was given to the mortgagors.   Before the maturity of the note, namely, August 12, 1901, the mortgagors, without the knowledge or consent of the bank, shipped to the mortgagees, Tamblyn & Tamblyn, 78 head of the cattle covered by the mortgage, who sold the same to the plaintiff in error (the defendant below), the Cudahy Packing Company, and received in payment therefor $2,331.11, which they applied in partial extinction of another indebtedness due to them by the mortgagors.   This action is brought by the bank against Cudahy & Co. for the conversion of the 78 head of cattle.   By stipulation it was tried to the court without a jury, and resulted in a general finding and judgment in favor of the plaintiff for $2,331.11.

Two errors of law are assigned, which it is claimed require a reversal of this judgment:   (1)  It is contended that the mortgage authorized the sale and the payment to the mortgagees, notwithstanding its assignment.   (2)  It is urged that the note was not negotiable, within the law merchant, and that the sale having been made by the mortgagors, through the original mortgagees, in ignorance of the assignment of the mortgage, the assignee cannot maintain this action.

The first contention is based upon the following language, which is printed on the back of the mortgage:

"All of said cattle, as herein mentioned, are to be held in said pasture and fed by the mortgagor during the term of this mortgage, and at least three days before the maturity of the note herein mentioned they shall be shipped and consigned to Tamblyn & Tamblyn at the stockyards at Kansas City, Missouri, and when sold by them the proceeds thereof shall be applied, first, in payment of the usual commissions to said Tamblyn & Tamblyn for selling the same and the balance, or so much thereof as may be necessary shall be applied to the indebtedness hereinbefore mentioned.

"If said cattle or any part thereof be consigned to or sold by any person except Tamblyn & Tamblyn, then said mortgagee shall be paid the proceeds of said sale and a commission of fifty cents per head on all the above described cattle so sold."

This instrument was not signed by the mortgagors nor is it in any way referred to in the mortgage.   It could not, therefore, be treated as a binding contract between the mortgagor and mortgagee.   It is a mere blank paper, with no force whatever.   The fact that it is printed upon the back of the mortgage, but not executed, might properly indicate that the mortgagors intentionally refused to be bound by its terms. A more natural interpretation would be that the mortgage was executed by the mortgagors without any knowledge whatever of this printed indorsement on the back of the instrument, and it would be a wholly

unjustified interpretation to hold that they were bound by terms to which they never subscribed. For these reasons, we consider that this indorsement was not binding even as between the original parties. Much less could it be held to be binding upon an assignee of the mortgage, or to qualify in any way his rights under the mortgage itself. But even if the instrument were binding as between the original parties, a fair construction of its language would limit it to the time during which the mortgagees continued to be the owners of the mortgage. Its primary object was to secure to the commission merchants their commissions on the sale of the cattle. It was never intended to destroy the mortgage itself. This, however, would be the result of a construction that would leave this indorsement binding notwithstanding a transfer of the mortgage. The assignee would really have no security whatever, under such an arrangement. He would be dependent upon the fidelity of the commission merchants. If the contention of counsel for the plaintiff in error is sound, the mortgagor and mortgagee had the right to sell and dispose of the mortgaged property, and whether the assignee of the mortgage would ever derive any benefit from it would be entirely dependent upon the fidelity of Tamblyn & Tamblyn. Instead of having a lien upon the property, the assignee of the mortgage would simply have the personal obligation of the original mortgagees. Neither the instrument nor the nature of the transaction justifies any such interpretation.

The note was payable to the order of Tamblyn & Tamblyn, but it contained the following provision: "And in case legal proceedings are instituted to enforce the collection of this note, we agree to pay ten per cent. of the entire amount due as attorney's fees." It is contended that this language destroyed the negotiability of the note, or, more accurately, made the instrument not a promissory note at all, but a mere chose in action. This is the holding of the Supreme Court of Missouri—the state in which this action arose. First National Bank v. Gay, 63 Mo. 33, 21 Am. Rep. 430; Samstag v. Conley, 64 Mo. 476; First National Bank v. Marlow, 71 Mo. 618; McCoy v. Green, 83 Mo. 626; Creasy v. Gray, 88 Mo. App. 454. The question, however, is one of general commercial law. The federal courts, in respect of it, are required to exercise an independent judgment. Such has been their uniform practice in regard to all questions affecting negotiable instruments. Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865. The case of Mercer County v. Hackett, 1 Wall. 83, 17 L. Ed. 548, presented a question very similar to the one now under consideration. The instrument in that case was executed by a corporation, and bore the corporate seal. The case arose in the state of Pennsylvania. The courts of that state had uniformly decided that the presence of a corporate seal destroyed the negotiability of such instruments. The Supreme Court, however, refused to follow this holding, the court saying:

"If this decision of the learned court was founded on the construction of the Constitution or statute law of the state, or the peculiar law of Pennsylvania as to titles to land, we would have felt bound to follow; but we have often decided that on questions of mercantile or commercial law, or usages which are not peculiar to any place, we do not feel bound to yield our own judgment."

There is a statute in the state of Missouri which has some bearing on the question.   It reads as follows:

"Every promissory note for the payment of money to the payee therein named or order or bearer, and expressed to be for value received, shall be due and payable as therein expressed, and shall have the same effect and be negotiable in like manner as inland bills of exchange."

The decisions of the Supreme Court of Missouri above referred to are not based upon this statute, but rest upon general considerations of the common law, as defining the essential elements of negotiable paper. The statute is affirmative in its language.   It declares what elements must be found in a promissory note, but it does not declare what effect the presence of incidental provisions, such as the payment of attorney's fees, shall have.   It is conceded that all the elements mentioned in the statute are present in the note in question.   It would not be a proper construction of the language which the Legislature has used to hold that every instrument which contained provisions other than those mentioned in the statute should be nonnegotiable.   It is not correct to say that promissory notes were not negotiable in England at common law.   The statute of Anne is declaratory simply of the common law.   It has never been construed by the English courts as creating any new rule.   It was enacted to remove the doubts created by the decisions of Chief Justice Holt.   This whole subject is discussed with remarkable clearness and learning in the case of Dunlop v. Silver, a Circuit Court decision, reported in 1 Cranch, 367, Fed. Cas. No. 4,169. See, also, Goodwin v. Robarts, L. R. 10 Ex. 337.   The statute of Missouri above quoted seems to have been enacted for the same general purpose as the statute of Anne, namely, to remove any doubt as to the negotiability of promissory notes.   We feel at liberty, therefore, to deal with this question as a question of general law, free from statutory restrictions of the state in which the case arose.

Treating it thus, the question at the present time presents little difficulty.   There has been considerable conflict in the courts of the different states on the subject, but the clear weight of authority at the present time sustains the doctrine that the incorporation of a provision for the payment of attorney's fees in negotiable paper does not destroy its commercial character.   The following states have so held:   Alabama (Montgomery v. Crossthwait, 90 Ala. 553, 8 South. 498, 12 L. R. A. 140, 24 Am. St. Rep. 832); Arkansas (Trader v. Chidester, 41 Ark. 242, 48 Am. Rep. 38); Georgia (Stapleton v. Louisville Banking Company, 95 Ga. 802, 23 S. E. 81); Illinois (Dorsey v. Wolfe, 142 Ill. 589, 32 N. E. 495, 18 L. R. A. 428, 34 Am. St. Rep. 106); Indiana (Stoneman v. Pyle, 35 Ind. 104, 9 Am. Rep. 637); Iowa (Shenandoah National Bank v. Marsh, 89 Iowa, 273, 56 N. W. 458, 48 Am. St. Rep. 381); Kansas (Seaton v. Scovill, 18 Kan. 433, 21 Am. Rep. 212, note, 26 Am. Rep. 779); Kentucky (Gaar v. Louisville Banking Company, 11 Bush, 180, 21 Am. Rep. 209); Louisiana (Dietrich v. Bayhi, 23 La. Ann. 767); Mississippi (Clifton v. Bank of Aberdeen, 75 Miss. 929, 23 South. 394); Nebraska (Heard v. Bank, 8 Neb. 10, 30 Am. Rep. 811); Oregon (Benn v. Kutzschan, 24 Or. 28, 32 Pac. 763); Tennessee (Oppenheimer v. Farmers' & Merchants' Bank, 36 S. W. 705); Texas (Hamilton Gin & Mill Co. v. Sinker, 74 Tex. 51, 11 S. W. 1056);

Washington (Colfax Second National Bank v. Anglin, 6 Wash. 403, 33 Pac. 1056). No decision has been rendered by the Supreme Court of the United States on this subject, but the question has been frequently before the Circuit Courts, and, the negotiability of the instruments sustained. Howenstein v. Barnes, 5 Dill. 482, Fed. Cas. No. 6,786; Bank of British North America v. Ellis (C. C.) 2 Fed. 44. The same doctrine has been approved by the Circuit Court of Appeals of the Sixth Circuit. Farmers' National Bank v. Sutton Manufacturing Co., 6 U. S. App. 312, 52 Fed. 191, 3 C. C. A. 1, 17 L. R. A. 595.

The following state decisions have held that such a stipulation renders the note nonnegotiable: California (Chase v. Whitmore, 68 Cal. 545, 9 Pac. 942); Montana (Stadler v. First Nat. Bank, 22 Mont. 190, 56 Pac. 111, 74 Am. St. Rep. 582); North Dakota (Decorah First Nat. Bank v. Laughlin, 4 N. D. 391, 61 N. W. 473). These decisions all rest upon a statute—being the same statute that was construed by this court in Second National Bank v. Basuier, 65 Fed. 58, 12 C. C. A. 517. Maryland (Maryland Fertilizing Co. v. Newman, 60 Md. 584, 45 Am. Rep. 750); Michigan (Altman v. Rittershofer, 68 Mich. 287, 36 N. W. 74, 13 Am. St. Rep. 341); Minnesota (Jones v. Radatz, 27 Minn. 240, 6 N. W. 800); Missouri (Trenton First Nat. Bank v. Gay, 63 Mo. 33, 21 Am. Rep. 430, and other cases above cited); North Carolina (New Windsor First Nat. Bank v. Bynum, 84 N. C. 24, 37 Am. Rep. 604); Pennsylvania (Woods v. North, 84 Pa. 407, 24 Am. Rep. 201); South Carolina (Carroll Co. Savings Bank v. Strother, 28 S. C. 504, 6 S. E. 313); Wisconsin (W. W. Kimball Co. v. Mellon, 80 Wis. 133, 48 N. W. 1100). The decisions which sustain the negotiability of notes containing a provision for the payment of attorney's fees have, in the main, been justified upon the ground that prior to the maturity of the note, and while it was current in the business world, the provision was inoperative; that it did not take effect until after the dishonor of the note, so that in any case the transferee would take subject to all the defenses existing between the original parties. This reasoning cannot be applied to provisions for the payment of exchange, and upon that ground notes containing such provisions have by many courts been held to be nonnegotiable. Hughitt v. Johnson (C. C.) 28 Fed. 865.

We believe that the whole subject might well be rested on safer and more fundamental grounds. Judge Mitchell, in writing the opinion of the Supreme Court of Minnesota in the case of Hastings v. Thompson, 55 N. W. 968, 21 L. R. A. 178, 40 Am. St. Rep. 315, indicated the correct doctrine when he said:

"The reason and purpose of the rule that the sum to be paid must be certain is that the parties to the instrument may know the amount necessary to discharge it without investigating facts not within the general knowledge of every one and which may be subject to more or less uncertainty, or more or less under the influence or control of one or other of the parties to the instrument."

The rule requiring certainty in commercial paper was a rule of commerce before it was a rule of law. It requires commercial, not mathematical, certainty. An uncertainty which does not impair the functions of negotiable instruments in the judgment of business men ought not to be regarded by the courts. The fine phrase of Chief Justice

Gibson in the case of Overton v. Tyler, 3 Pa. 346, 45 Am. Dec. 645, that a negotiable instrument "is a courier without luggage," has been made to do much service in the discussion of this subject. The real question, however, is who shall determine what constitutes "luggage" —the business world, or the judge in his library? In no branch of the law has the sound judgment of the English courts shown itself more conspicuously than in the treatment of this subject. Whenever a new instrument, varying in some of its features from the ordinary promissory note or bill of exchange, has been presented for admission to the class of commercial paper, those courts have called for their guidance men from the actual business world, best qualified to speak on the subject. If, from their evidence, it has appeared that the instrument in question was by the general custom and practice of the business world treated as a negotiable instrument, the court has given effect to that usage, and adjudged the instrument to be subject to the same law as other negotiable paper. This was true not only in the early and formative periods of the commercial law, coming down to the age of Lord Mansfield, but has been followed with the same freedom from time to time down to the current year. Those courts have never forsaken the business world to pursue a definition. A few of the many cases which might be cited will illustrate this practice. In 1824, in the case of Gorgier v. Mieville, 3 Barnewall & Cresswell, 45, the question was first raised whether bonds issued by a government should be treated as negotiable instruments. The court called for its instruction as witnesses the principal bankers of London, and, being advised by them that such instruments were generally treated by the commercial world as negotiable, the court assigned that character to them, and decided the case accordingly. The opinion of Chief Justice Cockburn in Goodwin v. Robarts, L. R. 10 Ex. 337, is not only a striking illustration of the practice which we are considering, but contains a masterly exposition of the whole subject. The instrument there involved was entirely outside of the class of promissory notes or bills of exchange. It was scrip issued by the banking house of Rothschild in London, entitling the holder, upon the making of certain payments, to the delivery of bonds thereafter to be issued by the Russian government. It will therefore be noticed that the instruments did not even provide for the payment of money at all, but simply for the delivery of bonds. By the testimony of bankers and others qualified to speak on the subject, it appeared that for some 30 years such scrip had been treated by the business world as negotiable, passing from hand to hand, free of defenses. It was contended, however, that such evidence was not admissible to determine whether an instrument was negotiable, but that it was for the court to declare the law from its general knowledge of the customs of the business world, and the qualities essential to such instruments under previous decisions. Speaking to this question, the Chief Justice said:

"The substance of Mr. Benjamin's argument is that because the scrip does not correspond with any of the forms of securities for money which have been hitherto held to be negotiable by the law merchant, and does not contain a direct promise to pay money, but only a promise to give security for money, it is not a security to which, by the law merchant, the character of negotiability can attach. Having given the fullest consideration to this argument,

we are of the opinion that it cannot prevail. It is founded on the view that the law merchant thus referred to is fixed, stereotyped, and incapable of being expanded and enlarged so as to meet the wants and requirements of trade in the varying circumstances of commerce. It is true that the law merchant is sometimes spoken of as a fixed body of law, forming part of the common law, and, as it were, coeval with it. But as a matter of legal history this view is altogether incorrect. The law merchant thus spoken of in reference to bills of exchange and other negotiable securities, though forming part of the general body lex mercatoria, is of comparatively recent origin. It is neither more nor less than the usages of merchants and traders in the different departments of trade, ratified by the decisions of courts of law, which, upon such usages being proved before them, have adopted them as settled law, with a view to the interests of trade and the public convenience. By this process, what before was usage only, unsanctioned by legal decision, has become ingrafted upon or incorporated into the common law, and may thus be said to form part of it."

The learned judge then proceeds to give instances of cases illustrating this view, and continues:

"It thus appears that all these instruments which are said to have derived their negotiability from the law merchant had their origin, and that at no very remote period, in mercantile usage, and were adopted into the law by our courts as being in conformity with the usages of trade, of which, if it were needed, a further confirmation might be found in the fact that, according to the old form of declaring on bills of exchange, the declaration always was founded on 'the custom of merchants.' Usage adopted by the courts having been thus the origin of the whole of the so-called law merchant as to negotiable securities, what is there to prevent our acting up to the principle acted upon by our predecessors, and followed in the precedents they have left to us? Why is it to be said that a new usage which has sprung up under altered circumstances is to be less admissible than the usages of past times? Why is the door to be now shut to the admission and adoption of usage in a matter altogether of cognate character, as though the law had been finally stereotyped and settled by some positive and peremptory enactment?"

This decision was affirmed in the House of Lords not only upon the ground of estoppel, but also upon the ground set forth in the opinion of Chief Justice Cockburn. 1 App. Cas. 476. It is quite manifest that if the English court had followed the ordinary definition of commercial paper, instead of having recourse to the business world, the instrument there in question would have been held to be nonnegotiable, for it lacked an attribute which is usually regarded as essential to commercial paper, namely, that it shall provide for the payment of money only. The same practice of taking the testimony of business men for the purpose of determining whether an instrument is negotiable or not is illustrated in London Joint Stock Bank v. Simmons, 1892 A. C. 201; also Bechuanaland Exploration Company v. London Trading Bank, 1898 2 Q. B. 658. This last case arose upon debentures issued by a railroad corporation. Speaking of the character of the instruments, Mr. Justice Kennedy, who delivered the opinion of the court, says:

"Now, it is, I think, unquestionable, and it was not disputed at the bar, that such a debenture as this, if viewed according to its tenor, merely, and not with regard to mercantile usage, does not belong to the class of negotiable instruments which the law has recognized as such by virtue either of the ancient law merchant or by virtue of statute (such as bills of exchange, promissory notes, and exchequer bills), and the delivery of which confers a good title to the person who acquires them in good faith and for value, notwithstanding a defect in the title of the transferror. It is most like a promissory note payable to bearer, but it is prevented from ranking as such by its conditions."

The instruments contained many conditions rendering them uncertain both as to the time of payment and the manner of payment, but the court, being advised by the leading bankers of London that such instruments had for a long time been treated as negotiable by the business world, held them to be negotiable, within the law merchant. The Supreme Court of the United States, in the case of Mercer County v. Hackett, 1 Wall. 83, 95, 17 L. Ed. 548, approves of the same doctrine. See, also, Rindskoff v. Barrett, 11 Iowa, 172; same case, 14 Iowa, 101; Renner v. The Bank of Columbia, 9 Wheat. 582, 6 L. Ed. 166; Mills v. Bank of United States, 11 Wheat. 431, 6 L. Ed. 512; The Bank of Washington v. Triplett, 1 Pet. 25, 7 L. Ed. 37; Cookendorfer v. Preston, 4 How. 317, 11 L. Ed. 992; Kilgore v. Bulkley, 14 Conn. 362.

Now, if provisions for the payment of attorney's fees and exchange were dealt with upon this basis of commercial usage, the rule of decision would be entirely plain. We have no evidence in this record on the subject, and need none, for we are informed by a great body of judicial decisions that for at least half a century it has been customary in nearly every state of the Union to incorporate such provisions in negotiable paper. This practice has been so general and so long continued that the court itself may now take judicial notice of it. In the judgment of business men, such provisions do not render promissory notes uncertain, or in any way affect their negotiability. These requirements, it should be remembered, do not offend against any rule of morals or public policy. The whole question is, do they render the instruments so uncertain as to destroy their fitness to pass current in the business world? The business world itself ought to be permitted to answer that question. It should be carefully noted that the question whether a given class of instruments shall be admitted to the category of negotiable paper is distinct from the question of the rights or liabilities of parties to such paper. These, usage could not modify or impair. A general custom of the business world may enlarge, but cannot abrogate, the established rules of law. Goodwin v. Robarts, L. R. 10 Ex. 337; Vermilye & Co. v. Adams Express Co., 21 Wall. 138, 22 L. Ed. 609.

We can learn from another source, in a trustworthy manner, the opinion of the business world as to the effect of provisions for the payment of exchange or attorney's fees upon instruments otherwise negotiable. In 1896 the commissioners appointed by the several states to promote uniformity of laws prepared the negotiable instruments act. It has since been adopted in 27 states and territories, including the great commercial states of Massachusetts, New Jersey, New York, Pennsylvania, Ohio, and Wisconsin. The concurrent action of the Legislatures of these several states may well be held to fairly represent the judgment and usage of the business world in this country. On the subject of certainty in negotiable paper, this act provides:

"Sec. 21. The sum payable is a sum certain within the meaning of this act, although it is to be paid:

❖ * ❖ * * * * * *

"(4) With exchange, whether at a fixed rate or at the current rate; or
"(5) With costs of collection or an attorney's fee in case payment shall not be made at maturity."

134 F.—35

The English bills of exchange act contains similar language in regard to a provision for the payment of exchange. It does not speak to the question of attorney's fees, for the practice of incorporating such provisions in promissory notes seems not to have obtained in that country.

Both upon authority and reason, we are therefore entirely satisfied that the note in question was negotiable, within the law merchant. That being so, the mortgage securing the note partook of its character, and, in the hands of the bank, was free from all equities between the original parties existing at the time of its transfer or arising subsequent thereto. Carpenter v. Longan, 16 Wall. 273, 21 L. Ed. 313; Sawyer v. Prickett, 19 Wall. 147, 22 L. Ed. 105.

We would not wish to be understood as deciding that a different result would have been reached if the indebtedness secured by the mortgage had been a mere chose in action. We leave that question open for decision when it shall arise. The doctrines of estoppel and good-faith purchaser have been steadily narrowing the "equities" of the original mortgagor or debtor, and enlarging the protection granted to a holder in good faith and without notice. Merchants' Bank of Buffalo v. Weill (Sup.) 52 N. Y. Supp. 37; Id., 163 N. Y. 486, 57 N. E. 749, 79 Am. St. Rep. 605; Ewart on Estoppel, 376 et seq.; Curtis v. Moore, 152 N. Y. 159, 46 N. E. 168, 57 Am. St. Rep. 506. In this last case it was held that the assignee of a recorded mortgage upon real estate which was conveyed by the mortgagor to the mortgagee after an assignment of the mortgage has a valid lien as against a purchaser of the land from the mortgagee who took without notice of the assignment. The mortgage in that case was given to secure a bond. It is, of course, well established that the mortgagor may pay the mortgagee of a mortgage securing a nonnegotiable debt after its assignment if the payment is made in ignorance of such assignment, and the same will have the effect of discharging the mortgage, but whether any transaction less than an actual payment can create an equity as against the assignee is a question which we prefer to leave open for future consideration.

The judgment of the trial court is affirmed.