## NEW BERN OIL & FERTILIZER CO. v. NATIONAL BANK OF KINSTON et al.

Circuit Court of Appeals, Fourth Circuit.
Oct. 16, 1928.

No. 2724.

L. I. Moore, of Newbern, N. C. (Moore & Dunn, William Dunn, Jr., and T. O. Moore, all of Newbern, N. C., on the brief), for appellant.

George B. Greene and John G. Dawson, both of Kinston, N. C. (Sutton & Greene and Fred I. Sutton, all of Kinston, N. C., on the brief), for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

SOPER, District Judge. During the year 1924, and for some time prior thereto, C. N. Fordham was engaged in the general merchandise business at Deep Run, N. C., and was particularly engaged in selling general supplies and fertilizer to farmers. He han-

dled the fertilizer under contract with the New Bern Oil & Fertilizer Company. Under its 1924 contract with him, the fertilizer company agreed to furnish some 300 tons of fertilizer, to be sold during the season at specified prices. It was agreed that settlement for all goods furnished should be made by Fordham on or before November 1. He was to guarantee payment for all goods sold by him on credit, by giving his promissory note to the company. He was to remit all cash paid to him for goods sold as promptly as received; and, upon all time sales, he was to indorse and deliver to the company on or before the settlement date, the simple or mortgage notes of purchasers and also all mortgages, liens, and other securities which he might take to secure the sale of the goods, said notes and securities to be held by the company as collateral security for the payment of his note. It was also agreed that all goods received by him, under the contract, all proceeds from the sale of goods, and all simple or mortgage notes, with all mortgages, lien bonds, and other securities taken to secure the payment for the goods, should be the property of the company, held in trust for it by him for the payment of his obligations. Under this contract the fertilizer company furnished $10,000 worth of fertilizer in 1924, nearly all of which was sold by Fordham to his customers prior to June of that year. He did not, however, turn over to the company all the collateral received by him from his customers or retain it in trust for the company's benefit, as he had promised.

Fordham's uniform practice in business was to take from his customers promissory notes, secured by chattel mortgages and liens on their crops for a sum estimated to be sufficient to cover, not only fertilizer, but also other goods and supplies which they would need during the year. He took such instruments in 1924. They contained no reference to the character of the goods furnished. No separate account was kept by him against his customers for fertilizer sold, and no separate security was taken therefor, but the fertilizer, as well as other goods, were charged generally to the accounts of the customers, whose notes, secured as aforesaid, were taken for the total amount.

During the year 1924, Fordham got into financial difficulties, and a receiver was appointed for him by the superior court of Lenoir county on June 20, 1924. The receiver conducted the business for some months. On September 5, 1924, a voluntary petition in bankruptcy was filed in the United States District Court, and later the receiver became the trustee in bankruptcy. The controversy in this case arises upon an intervening petition filed by the fertilizer company against the National Bank of Kinston and the trustee in bankruptcy, claiming that certain of the secured notes of Fordham's customers, which were the property of the fertilizer company, had been improperly delivered by him to the bank as collateral for a personal indebtedness. The purpose of the petition was to secure a decree requiring the bank to surrender to the fertilizer company the collateral in the hands of the bank and the proceeds of any collateral theretofore collected by the bank.

In effect, the litigation is between the two corporations, and the trustee has little interest therein. The evidence shows that on or about April 7, 1924, Fordham assigned and delivered to the bank promissory notes of his customers, secured by the collateral described, to the amount of $8,839.80, for the purpose, not only of securing the repayment of certain money then received from the bank, but also to secure a pre-existing indebtedness. Of this collateral, $2,903.80 had been given to Fordham by his customers on account of fertilizer supplied. On the day in question, Fordham executed a six months' note for $1,574.50 payable to the bank. The note also was signed by one Leslie Rouse, who seems to have been an accommodation maker or indorser. On the same day, he also executed a promissory note for $1,000, payable to the bank six months after date, and, for the payment thereof, deposited the collateral mentioned. This collateral note expressly provided that the security was deposited for the payment of the note or any other note given in extension or renewal thereof, as well as the payment of any other liability to the bank due or to become due, whether then existing or thereafter arising. The evidence is not clear as to what additional sum was loaned by the bank to Fordham when these notes were given, but it is certain that he then received either the sum of $1,000 or $1,574.50, or both of said amounts. Previously, he had been in the habit of borrowing from the bank, and on April 7, 1924, there was a pre-existing indebtedness, secured by a mortgage of $17,574.50, covering his lands and the lands of his wife. The evidence shows that the bank knew, when it received the collateral, that Fordham was in the business of selling fertilizer under contract with fertilizer companies, but it had no knowledge of the terms of the contract with the petitioner; nor did the bank know that the petitioner had any claim upon the notes, chattel mortgages, and liens transferred by Fordham to the bank.

The decision of the referee and of the District Court upon the petition for review were adverse to the fertilizer company.

▮ The fertilizer company contends that Fordham was merely its factor or agent, with power to sell the goods of his principal, but without power to affect the notes, mortgages, and liens received in payment therefor by wrongfully pledging them as security or satisfaction for a debt of his own, and that it is of no consequence that the bank was ignorant that Fordham did not own the securities. The Fertilizer company relies on such authorities as Warner v. Martin, 52 U. S. 208, 224, 13 L. Ed. 667, and such decions of the Supreme Court of North Carolina as Hoffman v. Kramer, 123 N. C. 570, 31 S. E. 828; Lance v. Butler, 135 N. C. 419, 47 S. E. 488; Chemical Co. v. Johnson, 98 N. C. 123, 3 S. E. 723; Chemical Co. v. McNair, 139 N. C. 326, 51 S. E. 949; Virginia-Carolina Chemical Co. v. Floyd, 158 N. C. 455, 74 S. E. 465; Cone v. Fruit Growers' Ass'n, 171 N. C. 530, 88 S. E. 860. These cases in the state court hold that, as between the parties to such a contract as that under consideration, not only the goods, but also the proceeds of sale, either in cash or in secured notes, are the property of the principal for whom the agent holds them in trust and that the title of the principal to the goods is superior to the claims of a pledgee to whom they have been wrongfully delivered by the agent. But these authorities are of little avail to the company in this case. That which was transferred by Fordham to the bank was not the goods and chattels of the fertilizer company, but negotiable promissory notes. It is true that the notes were secured either by chattel mortgages or by crop liens, but their negotiability was not thereby affected. On the contrary, the notes and the mortgaged property passed to the bank not only free from secret or latent equities existing between the parties to the instruments, but also free from such equities in favor of third parties of which it had no notice or knowledge. The rule is the same whether chattel or real estate mortgages are involved. Penisula Bank v. Wolcott (C. C. A.) 232 F. 68; Carpenter v. Longan, 16 Wall. 271, 21 L. Ed. 313; Coor v. Spicer, 65 N. C. 401; Cudahy Packing Co. v. State Nat. Bank (C. C. A.) 134 F. 538; Swift v. Washington Bank (C. C. A.) 114 F. 643; Satterwaite v. Ellis, 129 N. C. 67, 39 S. E. 726.

In other words, the law of negotiable instruments applies to the transfer of collateral by Fordham to the bank. See the Negotiable Instruments Act of North Carolina, codified in sections 3005, 3006, 3007, and 3037, of the Consolidated Statutes of North Carolina. Section 3005 provides that either an antecedent or pre-existing debt constitutes value. Section 3006 provides that, where value has at any time been given for the instrument, the holder is deemed a holder for value in respect to all parties who became such prior to that time. The bank therefore has the right to hold the collateral deposited not only as security for the money then loaned, but also as security for the antecedent indebtedness. Brook v. Sullivan, 129 N. C. 190, 39 S. E. 822; American Exch. Nat. Bank v. Seagroves, 166 N. C. 609, 82 S. E. 947. Section 3007 sets out the law applicable to notes transferred as collateral. It provides that, where the holder has a lien on the instrument arising either from contract or by implication of law, he is deemed a holder for value to the extent of his lien. Section 3008 is pertinent to the lack of knowledge by the bank of the fertilizer company's interest in the collateral. It provides that, to constitute notice of a defect in the title of the person negotiating the instrument, the person to whom it is negotiated must have had actual knowledge of the defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith. There is no evidence tending to show either that the bank had such knowledge, or that it acted in bad faith in accepting the collateral in question. The interpretation of this section by the Supreme Court of North Carolina leaves no doubt in our minds that the bank's title to the collateral is not open to attack. Smathers v. Toxaway Hotel Co., 162 N. C. 346, 78 S. E. 224; Holleman v. Harnett County Trust Co., 185 N. C. 49, 115 S. E. 825.

▮ The fertilizer company also contends that in any event it is entitled to the collateral to the extent of $1,574.50, the amount of one of the notes discounted on April 7, 1924. Leslie Rouse was an accommodation maker or indorser upon this note, and was financially able to pay it; but the bank did not pursue its remedy against him. Therefore the company says an equal amount of collateral should be released and applied to the payment of its indebtedness, in analogy to the practice of marshaling assets in certain cases in equity. No authorities on the point have been cited, and we think that it is not well taken. The doctrine of marshaling assets applies only when it can be done with justice to the creditor and his debtor, and without prejudice to third persons. The enforcement is not a matter of legal right, but is governed by equitable principles, in the sound discretion of the court. 38 C. J. 1367. Thus it is held that a creditor, who has a

claim against two debtors, one a principal and the other a surety, cannot be compelled by another creditor of the principal debtor to exhaust his remedy against the surety before proceeding against the principal. It would be inequitable in this case to compel the bank to proceed against the indorser, who is liable only upon default of the maker of the note, rather than against the collateral in its hands. Union Bank v. Laird, 2 Wheat. 390, 4 L. Ed. 269; Swift & Co. v. Kortrecht (C. C. A.) 112 F. 709. Frasse & Co. v. Hartford Automotive Parts Co. (D. C.) 300 F. 876.

▮ Finally the petitioner contends that the bank should pay into the hands of the trustee in bankruptcy 51 per cent. of the proceeds of the collateral which it collected. It appears that, when the receiver in the state court was conducting the business of Fordham, the only parties interested were secured creditors holding the collateral described, namely, the New Bern Fertilizer Company, the Armour Fertilizer Company, and the bank. With the consent of the court, the receiver furnished certain supplies from the stock on hand and from stock purchased by him, to farmers, who had given in advance their promissory notes, secured by the collateral, in payment for goods to be needed during the season, as was the custom. As a result, the collateral in the hands of the secured creditors was increased in value. To compensate for this benefit, the referee decided that the trustee in bankruptcy was entitled to make a charge of 51 per cent. against the proceeds of the collateral of these creditors collected by the receiver, basing the percentage upon the ratio of total expenses of the receiver and trustee to their total receipts. It happened, however, that the bank collected certain collateral itself, without the assistance of the receiver or trustee, and it is urged that it should be also charged with 51 per cent. of these collections. We think that this point should also be overruled. The record does not show to what extent each secured creditor benefited by the receivership, but it seems that the aggregate amount charged against the secured creditors approximated the amount expended in their behalf. It also appears that the New Bern Fertilizer Company itself made collections upon collateral which were not subjected to the 51 per cent. deduction. We do not find anything to indicate that the bank did not pay its fair share of the expenses of the receiver and trustee, as compared with the other secured creditors.

The decree of the District Court is affirmed.