ASSOCIATED EAST MORTGAGE COMPANY *v.* HIGHLAND PARK, INC., ET AL.

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, JS.

Argued November 10, 1976—decision released February 15, 1977

*Alexander Winnick,* for the appellants (named defendant et al.).

*Richard G. Adams,* with whom, on the brief, was *Samuel J. Henderson,* for the appellee (plaintiff).

HOUSE, C. J. This is an appeal from the judgment rendered by the Superior Court in an action brought to foreclose a mortgage on a parcel of land located in the town of Cheshire. The court found that the allegations in the complaint were true, and that the sum of $1,900,456 in principal, plus interest of $383,760.21 to February 28, 1975, plus interest at the rate of $18,212.70 per month and $598.77 per diem thereafter to date of payment or redemption, plus itemized costs of collection, was due the plaintiff by the named defendant and the defendant guarantors on the debt, and it fixed the law day for the named defendant as November 18, 1975.

The defendants Highland Park, Inc., the mortgagor, and Leonard Intelisano, Jr., and Clare Intelisano, guarantors of the mortgage debt, appealed

from the judgment, assigning numerous claims of error. Some of these have not been briefed and are considered abandoned. *Gebrian* v. *Bristol Redevelopment Agency,* 171 Conn. 565, 570, 370 A.2d 1055. The assignments of error which have been briefed raise four issues: (1) Did the court err in concluding that the plaintiff had no obligation to forbear from foreclosing on the date this action was commenced? (2) Can a domestic, commercial corporation borrow $2,000,000, secure the loan with a mortgage on real estate with interest at a rate never exceeding 15 percent per year and still raise the defense of usury? (3) If the corporate borrower cannot raise the defense of usury, can the guarantors on the note independently raise that defense? (4) Is a variable interest rate based on the prime rate vague or definite?

Before we attempt to summarize the relevant facts, it is pertinent to refer to the assignments of error related to the court's finding. The defendants assigned as error the court's refusal to find 122 paragraphs of their draft finding, asserting that the facts stated in those paragraphs were admitted or undisputed. They also attacked 31 paragraphs of the court's finding as having been made without evidence. We consider these wholesale attacks on the finding to have been abandoned since the defendants' brief contains nothing in support of the claims and although the appendix to their brief contains in narrative form a summary of the testimony of individual witnesses none of it is keyed to the attack on the finding. It serves no useful purpose to support a claim that a fact is admitted or undisputed merely by including in an appendix testimony which would support a finding differing from that filed by the trial court. A fact is not admitted or undisputed

merely because it has not been contradicted. Since the question of credibility is for the trier, "[t]o secure an addition to the finding, an appellant must point to some part of the appendix, the pleadings, or an exhibit properly before us which discloses that the appellee admitted that the fact in question was true or that its truth was conceded to be undisputed. Practice Book § 628 (a); *Martin* v. *Kavanewsky,* 157 Conn. 514, 515, 255 A.2d 619; Maltbie, Conn. App. Proc. § 158." *Malarney* v. *Peterson,* 159 Conn. 342, 344, 269 A.2d 274; *William G. Major Construction Co.* v. *DeMichely,* 166 Conn. 368, 370, 349 A.2d 827. As to the claims that the court found certain facts without evidence, the brief of the plaintiff, in the manner suggested by Maltbie, Conn. App. Proc. § 328, contains keyed reference to evidence, pleadings, and exhibits which support each of the findings claimed by the defendants to have been made without supporting evidence.

In these circumstances the efforts of the defendants to alter the court's finding of facts cannot succeed. In testing the court's conclusions we test them by that finding, not by the evidence, and those conclusions must stand unless they are legally or logically inconsistent with the facts found or unless they involve the application of some erroneous rule of law material to the case. *Roby* v. *Connecticut General Life Ins. Co.,* 166 Conn. 395, 397, 349 A.2d 838; *Connecticut Bank & Trust Co.* v. *Bovey,* 162 Conn. 201, 205–206, 292 A.2d 899.

The court found the following significant facts which, while lengthy in recital, we deem essential to an understanding of our decision on the merits of this appeal: On September 14, 1972, the defendant, Highland Park, Inc., by its president, Leonard

Intelisano, Jr., executed a promissory note, payable
to the order of the plaintiff, Associated East Mort-
gage Co., in the sum of $2,000,000. Interest on the
principal sum was to be paid at the rate of either
8½ percent per year or 3 percent per year above the
"prime rate" as determined by the Chase Manhattan
Bank, New York, New York, whichever was greater.
The note also provided that interest rate changes
would become effective on the first day of the month
following any change in the "prime rate" as reported
by the Chase Manhattan Bank and that the last rate
established by that bank during the preceding month
would be the "prime rate" upon which the interest
rate would be based.

The note was secured by a mortgage on land
located on Jarvis Street and Peck Lane in the town
of Cheshire. In the mortgage deed, Highland Park,
Inc., agreed to develop and improve the land and not
to cease substantially the work of developing and
improving it for any period of thirty consecutive
days. Highland Park also agreed to construct, or
cause to be constructed, streets, facilities for the
distribution of electricity and water, facilities for
telephone service, and storm sewers. It further
agreed that, in the event of a default in the payment
of the indebtedness when due, the plaintiff would be
entitled to receive interest on the entire unpaid prin-
cipal balance at the rate of either 11½ percent or the
highest rate of interest set forth in the note, which-
ever was greater. Interest was to be computed from
the due date until the actual receipt and collection of
the entire indebtedness. The effect of the default
clause was that, for any month after default during
which the prime rate was 8½ percent or more, the
interest would be the same as before default. In
those situations where the prime rate dropped to

below 8½ percent, the after-default interest rate would be greater than the before-default interest rate.

The court further found that the term "prime rate," as used in the note and the deed, has the same meaning as that given to it by the country's financial community. It is, in general, the rate at which the best borrowers can borrow. Borrowers of lesser quality, with loans of greater risk, receive loans with interest rates greater than prime rate. The prime rate fluctuates with money market conditions so that the bank can charge a rate to borrowers which is consistent with the rates it is paying for using the money of its depositors.

When the note and mortgage deed were executed in September, 1972, the term "prime rate," as used in the note and mortgage deed, referred to that "prime rate" which was to be determined by the Chase Manhattan Bank of New York. The rate was ascertainable either by a phone call or on the basis of published lists which could be obtained upon request.

In April, 1973, seven months after the parties executed the note and deed, and from then until the end of January, 1975, a new concept and a new terminology in the banking community came into existence with the creation of a "dual rate" or "two-tier" prime rate, by reason of the creation of a new rate, called the "small business prime rate." This small business rate, a lower interest rate, under the criteria issued in April, 1973, by the committee on interest and dividends of the federal pay board, was available to the small borrower. A small borrower was defined as one who borrowed less than $350,000 and who had assets of $1,000,000 or less. In the present case, the

defendant, Highland Park, Inc., borrowed $2,000,000, plus interest, and the value of the defendant's assets exceeded $1,000,000. Under the criteria established by the committee on interest and dividends of the federal pay board, Highland Park, Inc., would not have been considered a small borrower and, therefore, would not have been entitled to the small business rate.

After the creation of the "small business prime rate," what had previously been referred to simply as the "prime rate" was designated the "large business prime rate." The plaintiff borrowed exclusively on the basis of the "large business prime rate" and charged its borrowers on the same basis. From September, 1973, until February, 1975, interest payments were billed based upon the large business prime rate plus 3 percent. During that period of time, this prime rate fluctuated between 9 percent and 12 percent.

The mortgage deed contained a clause incorporating the note. The note provided that any default under the mortgage deed was a default under the note. The deed similarly provided that any default under the note was a default under the mortgage.

The defendants, Leonard Intelisano, Jr., and Clare Intelisano, together with Paul and Marion Casavina, in a separate instrument, executed a guarantee to the plaintiff unconditionally, jointly and severally, for the prompt payment of any and all sums due or to become due under the promissory note and further guaranteed the due performance of all the obligations of the defendant, Highland Park, Inc., and its covenants and agreements contained in either the mortgage note or the mortgage deed.

From September 14, 1972, to May 31, 1973, the plaintiff advanced a total of $1,900,456. Interest on the unpaid principal balance was billed on a monthly basis, as of the first day of each month. Payments of interest were made on time until July 1, 1973. After that, in the latter part of 1973, the defendant, Leonard Intelisano, Jr., requested that $100,000, which had not been disbursed, be applied to cover interest on the loan. This request, however, was refused.

On October 11, 1973, with the August and September interest payments overdue by two months and one month, respectively, David Savage, the plaintiff's executive vice president, talked with the defendants, Leonard Intelisano, Jr., and Clare Intelisano, requesting that the defendants pay the interest for August immediately and the interest for September within thirty days. Savage promised the defendants, Leonard Intelisano, Jr., and Clare Intelisano, that if the August and September payments were made he would not commence foreclosure proceedings until the end of December, 1973. Savage wanted the interest for August and September paid and the defendant corporation to pay off the mortgage by refinancing the debt. Refinancing was Savage's ultimate goal, and the interest payments were conditions for the defendants to gain time for refinancing. The plaintiff was not interested in drawing out the process of payment on the existing loan.

Two days after the October 11 meeting, the August interest was paid. The September interest, however, was never paid. Upon the failure of the defendants to live up to the conditions agreed to on October 11, 1973, a demand for payment in full was made upon them by a letter dated November 12, 1973. The letter

indicated that unless payment in full was received on or before December 12, 1973, the plaintiff would "initiate appropriate legal action."

In January, 1974, there were negotiations involving Leonard Intelisano, Jr., and an attorney about a partnership agreement, or participation, which would advance $3,500,000 to the defendants. The defendants, however, did not take up available refinancing during the period between default and the start of foreclosure, hoping for another and better opportunity which never materialized.

Although the defendants did not comply with the conditions specified by Savage in the meeting of October 11, 1973, the plaintiff did not initiate foreclosure proceedings until January 14, 1974, when the plaintiff brought this action in the Superior Court asking for foreclosure of the mortgage, possession of the mortgaged premises, a deficiency judgment and damages. On June 18, 1975, the trial court found all allegations of the complaint true and rendered judgment for the plaintiff, finding that the sum of $1,900,456 in principal, plus interest to date of payment, or redemption, was due and fixing the law days for redemption to begin on November 18, 1975.

The first claim briefed by the defendants—that the court erred in concluding that on the date this action was commenced the plaintiff had an obligation to forbear from foreclosing—is without merit. The finding fully supports the court's conclusion that the plaintiff did not agree to forbear from instituting an action for foreclosure. At most, the agreement was a conditional one for a temporary delay of foreclosure, not an extension of time for payment. The temporary delay was also made conditional on the

defendants, making up two deficient payments which they failed to do. Even then, although the conditions for a temporary delay of foreclosure were not met, foreclosure action was not initiated until January 14, 1974. While the plaintiff hoped that the defendants'· loan would be refinanced, the alternative to refinancing was foreclosure.

Furthermore, there was no consideration to support an agreement either to extend the time for payments on the mortgage or to forbear from foreclosure. The promises claimed by the defendants to be consideration were the promises to develop and improve the land and pay interest monthly, both of which the defendants were already bound to do. *State National Bank* v. *Dick,* 164 Conn. 523, 529, 325 A.2d 235.

The second claim briefed by the defendants is that the loan made to Highland Park, Inc., was usurious. We agree with the conclusion of the trial court that it was not.

The loan to Highland Park, Inc., falls within the exemption provisions of § 37-9 of the General Statutes[1] which expressly exempts certain loans from the operation of the usury statutes, which are §§ 37-4

---

[1] "[General Statutes] Sec. 37-9. LOANS TO WHICH PROHIBITIONS DO NOT APPLY. The provisions of sections 37-4, 37-5 and 37-6 shall not affect any loan made prior to September 12, 1911, nor any loan made by any national bank or any bank or trust company incorporated under the laws of this state, rny federal or state chartered savings and loan association or any private banker nor any bona fide mortgage of real property for a sum in excess of five thousand dollars, nor any loan crrying an interest rate of not more than eighteen per cent per annum made to a foreign or domestic corporation organized for profit and engaged primarily in commercial, manufacturing or industrial pursuits, provided the original indebtedness to be repaid is in excess of ten thousand dollars. . . ."

through 37-6 of the General Statutes. The exemption provisions of § 37-9 apply because Highland Park, Inc., a Connecticut corporation, was engaged in the business of real estate development and was, thus, a "domestic corporation organized for profit and engaged primarily in commercial . . . pursuits." Also, the loan was made by a private banker, was secured by a bona fide mortgage of real property in excess of $5000, carried an interest rate which was below 18 percent per year and, in fact, never exceeded 15 percent.

Even if the mortgage loan in this case carried interest in excess of 18 percent per year, since there is no suggestion that the mortgage was not a bona fide one it would appear that the transaction would still fall within the exemption provisions of § 37-9. Because of this exemption, the defense of usury is unavailable in a suit for foreclosure of the mortgage, even if the defense would be available in a suit upon the note if upon foreclosure of the mortgaged property it was necessary to act upon a deficiency judgment. See *Atlas Realty Corporation* v. *House,* 120 Conn. 661, 183 A. 9.

The third claim briefed by the defendants follows from the second and raises the question whether the guarantors on a corporate note can successfully raise the defense of usury on the note when that defense is not available to the corporate borrower. The court concluded that they cannot. We agree with this conclusion which is in accord with the weight of authority. See 2 Anderson, Uniform Commercial Code (2d Ed.) § 3-415:14. As stated in 38 Am. Jur. 2d 1056, Guaranty, § 51: "While a few early decisions held that indorsers could interpose the defense of usury even though the corporate maker was pre-

cluded by statute from doing so, the rule is now recognized that a guarantor is also precluded from interposing usury as a defense." The rule is stated in the annotation, "Statute denying defense of usury to corporation," 63 A.L.R.2d 924, 950, as follows: "[I]t is now generally recognized that a statute withdrawing the defense of usury from a corporation applies also to individual guarantors, sureties, and indorsers on corporate obligations, so that they, as well as the corporation, are precluded from interposing usury as a defense." The many cases cited in the annotation fully support the rule as stated, and we find no error in the decision of the trial court following it.

The fourth claim briefed by the defendants is that the reference to "prime rate" in the note and mortgage is "vague and indefinite" and that the court erred in concluding that the reference to prime rates of interest was definite.

Once again we turn to the court's finding of facts to ascertain if it supports the court's conclusion. *Windham Community Memorial Hospital* v. *Willimantic,* 166 Conn. 113, 117, 348 A.2d 651; *Walsh* v. *Turlick,* 164 Conn. 75, 79, 316 A.2d 759. The finding is that the prime rate in banking is "the rate at which the best borrowers can borrow" which is set from time to time by the loaning banks and moves up and down with money market conditions. In accordance with the terms of the note and mortgage, the prime rate applicable to them was that determined by the Chase Manhattan Bank of New York City and could be ascertained by a telephone call to the bank or on the basis of published lists which could be obtained upon request. The court also found that when in 1973 a dual or two-tier prime rate was established,

differentiating between "small business prime" and "large business prime" the latter rate was applicable to the defendant borrower because of the value of its assets and the size of the loan. In turn these findings of facts were all supported by the testimony of the witness Charles Daley, a certified public accountant and banker who qualified as an expert witness and whose testimony was summarized in the appendix to the plaintiff's brief. We find no error in the conclusion of the court that "[t]he reference to 'prime rates' constituted a reference to interest which was definite, rather than vague and indefinite."

The subject of the remaining paragraphs of the defendants' statement of issues concerning the claimed errors in computation of interest have not been briefed and are, accordingly, considered abandoned. *Hall* v. *Weston,* 167 Conn. 49, 51, 355 A.2d 79; Maltbie, Conn. App. Proc. § 327.

There is no error. The case is remanded with direction to render judgment as on file except for such modification as is made necessary by the lapse of time since the date of the original judgment.

In this opinion the other judges concurred.