FREDERICK R. TAYLOR, JR., TRUSTEE, ET AL.

V.

WILLIAM F. ROEDER, JR., TRUSTEE

Record No. 840671

September 4, 1987

Present: All the Justices

*Bennett A. Brown (Gilliam, Sanders & Brown*, on brief), for appellants.

*Joyce A. Naumann Massey (Carl M. Rizzo; Roeder, Durrette & Davenport, P.C.*, on brief), for appellee.

*Amicus Curiae: Federal Home Loan Mortgage Corporation (Garrett C. Burke; Scott C. Reed; Michael S. Miller; Kirkpatrick & Lockhart*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

The dispositive question in this case is whether a note providing for a variable rate of interest, not ascertainable from the face of the note, is a negotiable instrument. We conclude that it is not.

The facts are undisputed. VMC Mortgage Company (VMC) was a mortgage lender in Northern Virginia. In the conduct of its business, it borrowed funds from investors, pledging as security the notes secured by deeds of trust which it had obtained from its borrowers. Two of these transactions became the subject of this suit. Because they involve similar facts and the same question of law, they were consolidated for trial below and are consolidated in a single record here pursuant to former Rule 5:23.

In the first case, Olde Towne Investment Corporation of Virginia, Inc., on September 11, 1979, borrowed $18,000 from VMC, evidenced by a 60-day note secured by a deed of trust on land in Fairfax County. The note provided for interest at "[t]hree percent (3.00%) over Chase Manhattan Prime to be adjusted monthly." The note provided for renewal "at the same rate of interest at the option of the makers up to a maximum of six (6) months in sixty (60) day increments with the payment of an additional fee of [t]wo (2) points." The note was renewed and extended to November 11, 1980, by a written extension agreement signed by Olde Towne and by VMC.

In May 1981, Frederick R. Taylor, Jr., as trustee for himself and other parties, entered into a contract to buy from Olde Towne the land in Fairfax County securing the $18,000 loan. Taylor's title examination revealed the VMC deed of trust. He requested the payoff figures from VMC and forwarded to VMC the funds VMC said were due. He never received the cancelled Olde Towne note, and the deed of trust was not released.

In the second case, Richard L. Saslaw and others, on December 31, 1979, borrowed $22,450 from VMC evidenced by a 12-month note secured by deed of trust on Fairfax County land. This note also bore interest at "3% over Chasemanhattan [sic] prime adjusted monthly." Interest was to be "payable quarterly beginning April 1, 1980." In November 1980, Virender and Barbara Puri entered into a contract to purchase from Saslaw, et al., the land subject to the last-mentioned deed of trust. The Puris designated the same Frederick R. Taylor, Jr., as their settlement attorney. Taylor's title examination revealed VMC's deed of trust. Taylor again requested a payoff figure from VMC. At settlement, Saslaw objected to the figure, communicated with VMC and received

VMC's agreement to an adjusted figure. Taylor paid the adjusted amount to VMC. Again, Taylor failed to receive the cancelled Saslaw note, and the Saslaw deed of trust was not released.

Cecil Pruitt, Jr., was a trustee of a tax-exempt employees' pension fund. He invested some of the pension fund's assets with VMC, receiving as collateral pledges of certain secured notes that VMC held. The Saslaw note was pledged and delivered to him on January 25, 1980; the Olde Towne note was pledged and delivered to him on September 12, 1980. No notice was given to the makers, or to Taylor, that the notes had been transferred, and all payments on both notes were made to and accepted by VMC.

VMC received and deposited in its account sufficient funds to pay both notes in full, but never informed Pruitt of the payments and made no request of him for return of the original notes. In February 1982, VMC defaulted on its obligation to Pruitt for which both notes had been pledged as collateral. In May 1982, VMC filed a bankruptcy petition in federal court.

Learning that the properties securing both notes had been sold, Pruitt demanded payment from the respective original makers as well as the new owners of the properties, contending that he was a holder in due course. The makers and new owners took the position that they had paid the notes in full. Pruitt caused William F. Roeder, Jr., to qualify as substituted trustee under both deeds of trust and directed him to foreclose them. Taylor and the Puris filed separate bills of complaint against Roeder, trustee, seeking to enjoin the foreclosure sales. The chancellor entered a temporary injunction to preserve the *status quo* and heard the consolidated cases *ore tenus*. By letter opinion incorporated into a final decree entered February 3, 1984, the chancellor found for the defendant and dissolved the injunctions. We granted the complainants an appeal. The parties have agreed on the record that foreclosure will be withheld while the case is pending in this Court.

██ Under the general law of contracts, if an obligor has received no notice that his debt has been assigned and is in fact unaware of the assignment, he may, with impunity, pay his original creditor and thus extinguish the obligation. His payment will be a complete defense against the claim of an assignee who failed to give him notice of the assignment. *Evans* v. *Joyner*, 195 Va. 85, 88, 77 S.E.2d 420, 422 (1953).

██ Under the law of negotiable instruments, continued in effect under the Uniform Commercial Code, the rule is different:

the makers are bound by their contract to make payment to the *holder. See Trustees of Internal Imp. Fund* v. *Lewis,* 34 Fla. 424, 428, 16 So. 325, 326-327 (1894); *Hobgood* v. *Sylvester,* 242 Or. 162, 167, 408 P.2d 925, 927 (1965); *Perkins* v. *Hall,* 123 W.Va. 707, 716, 17 S.E.2d 795, 801 (1941); Code § 8.3-413. Further, a holder in due course takes the instrument free from the maker's defense that he has made payment to the original payee, if he lacks notice of the payment and has not dealt with the maker. Code § 8.3-305. Thus, the question whether the notes in this case were negotiable is crucial.

Code § 8.3-104(1) provides, in pertinent part:

Any writing to be a negotiable instrument within this title must

. . . .

(b) contain an unconditional promise or order to pay a sum certain in money . . . .

The meaning of "sum certain" is clarified by Code § 8.3-106:

(1) The sum payable is a sum certain even though it is to be paid
(a) with stated interest or by stated installments; or
(b) with stated different rates of interest before and after default or a specified date; or
(c) with a stated discount or addition if paid before or after the date fixed for payment; or
(d) with exchange or less exchange, whether at a fixed rate or at the current rate; or
(e) with costs of collection or an attorney's fee or both upon default.
(2) Nothing in this section shall validate any term which is otherwise illegal.

Official Comment 1, which follows, states in part:

It is sufficient [to establish negotiability] that at any time of payment the holder is able to determine the amount then payable *from the instrument itself* with any necessary computation . . . . The computation must be one which can be

made *from the instrument itself without reference to any outside source,* and this section does not make negotiable a note payable with interest "at the current rate."

(Emphasis added.) Code § 8.3-107 provides an explicit exception to the "four corners" rule laid down above by providing for the negotiability of instruments payable in foreign currency.

■ We conclude that the drafters of the Uniform Commercial Code adopted criteria of negotiability intended to exclude an instrument which requires reference to any source outside the instrument itself in order to ascertain the amount due, subject only to the exceptions specifically provided for by the U.C.C. *See Salomonsky v. Kelly,* 232 Va. 261, 264, 349 S.E.2d 358, 360 (1986).

The appellee points to the Official Comment to Code § 8.3-104. Comment 1 states that by providing criteria for negotiability "within this Article," (adopted in Virginia as "within this title") § 8.3-104(1) "leaves open the possibility that some writings may be made negotiable by other statutes or by judicial decision." The Comment continues: "The same is true as to any new type of paper which commercial practice may develop in the future." The appellee urges us to create, by judicial decision, just such an exception in favor of variable-interest notes.

■ Appellants concede that variable-interest loans have become a familiar device in the mortgage lending industry. Their popularity arose when lending institutions, committed to long-term loans at fixed rates of interest to their borrowers, were in turn required to borrow short-term funds at high rates during periods of rapid inflation. Variable rates protected lenders when rates rose and benefitted borrowers when rates declined. They suffer, however, from the disadvantage that the amount required to satisfy the debt cannot be ascertained without reference to an extrinsic source — in this case the varying prime rate charged by the Chase Manhattan Bank. Although that rate may readily be ascertained from published sources, it cannot be found within the "four corners" of the note.

Other courts confronted with similar questions have reached differing results. *See, e.g., A. Alport & Son, Inc. v. Hotel Evans, Inc.,* 65 Misc.2d 374, 376-77, 317 N.Y.S.2d 937, 939-40 (1970) (note bearing interest at "bank rates" not negotiable under U.C.C.); *Woodhouse, Drake and Carey, Ltd. v. Anderson,* 61

Misc.2d 951, 307 N.Y.S.2d 113 (1970) (note providing for interest at "8-½% or at the maximum legal rate" was not usurious. Inferentially, the note was negotiable.); *Farmers Production Credit Ass'n* v. *Arena*, 145 Vt. 20, 23, 481 A.2d 1064, 1065 (1984) (variable-interest note not negotiable under U.C.C.).

■ The U.C.C. introduced a degree of clarity into the law of commercial transactions which permits it to be applied by laymen daily to countless transactions without resort to judicial interpretation. The relative predictability of results made possible by that clarity constitutes the overriding benefit arising from its adoption. In our view, that factor makes it imperative that when change is thought desirable, the change should be made by statutory amendment, not through litigation and judicial interpretation.* Accordingly, we decline the appellee's invitation to create an exception, by judicial interpretation, in favor of instruments providing for a variable rate of interest not ascertainable from the instrument itself.

■ In an alternative argument, the appellee contends that even if the notes are not negotiable, they are nevertheless "symbolic instruments" which ought to be paid according to their express terms. Those terms include the maker's promises to pay "to VMC Mortgage Company *or order*," and in the event of default, to make accelerated payment "at the option of the *holder*." The emphasized language, appellee contends, makes clear that the makers undertook an obligation to pay any party who held the notes as a result of a transfer from VMC. Assuming the abstract correctness of that argument, it does not follow that the makers undertook the further obligation of making a monthly canvass of all inhabitants of the earth in order to ascertain who the holder might be. In the absence of notice to the makers that their debt had been assigned, they were entitled to the protection of the rule in *Evans* v. *Joyner* in making good-faith payment to the original payee of these non-negotiable notes.

Accordingly, we will reverse the decree and remand the cause to the trial court for entry of a permanent injunction against foreclosure.

*Reversed and remanded.*

---

* In 1981 the legislature of Tennessee amended its version of U.C.C. § 3-106 to provide that variable-interest notes will be negotiable. Tenn. Code Ann. § 47-3-106(1) (f) and (g).

COMPTON, J., dissenting.

The majority views the Uniform Commercial Code as inflexible, requiring legislative action to adapt to changing commercial practices. This overlooks a basic purpose of the Code, flexibility and adaptability of construction to meet developing commercial usage.

According to Code § 8.1-102(1), the UCC "shall be liberally construed and applied to promote its underlying purposes and policies." One of such underlying purposes and policies is "to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." § 8.1-102(2)(b). Comment 1 to this section sets out clearly the intention of the drafters:

> "This Act is drawn to provide flexibility so that, since it is intended to be a semipermanent piece of legislation, it will provide its own machinery for expansion of commercial practices. *It is intended to make it possible for the law embodied in this Act to be developed by the courts in light of unforeseen and new circumstances and practices.* However, the proper construction of the Act requires that its interpretation and application be limited to its reason." (Emphasis added).

The majority's rigid interpretation defeats the purpose of the Code. Nowhere in the UCC is "sum certain" defined. This absence must be interpreted in light of the expectation that commercial law continue to evolve. The § 8.3-106 exceptions could not have been intended as the exclusive list of "safe harbors," as the drafters anticipated "unforeseen" changes in commercial practices. Instead, those exceptions represented, at the time of drafting, recognized conditions of payment which did not impair negotiability in the judgment of businessmen. To limit exceptions to those existing at that time would frustrate the "continued expansion of commercial practices" by freezing the Code in time and requiring additional legislation whenever "unforeseen and new circumstances and practices" evolve, regardless of "custom, usage, and agreement of the parties."

> "The rule requiring certainty in commercial paper was a rule of commerce before it was a rule of law. It requires commercial, not mathematical, certainty. An uncertainty which does not impair the function of negotiable instruments in the judgment of business men ought not to be regarded by the

courts . . . . The whole question is, do [the provisions] render the instruments so uncertain as to destroy their fitness to pass current in the business world?" *Cudahy Packing Co. v. State National Bank of St. Louis*, 134 F. 538, 542, 545 (8th Cir. 1904).

Instruments providing that loan interest may be adjusted over the life of the loan routinely pass with increasing frequency in this state and many others as negotiable instruments. This Court should recognize this custom and usage, as the commercial market has, and hold these instruments to be negotiable.

The majority focuses on the requirement found in Comment 1 to § 8.3-106 that a negotiable instrument be self-contained, understood without reference to an outside source. Our cases have interpreted this to mean that reference to terms in another agreement which materially affect the instrument renders it nonnegotiable. *See, e.g., McLean Bank v. Nelson, Adm'r*, 232 Va. 420, 350 S.E.2d 651 (1986) (where note was accepted "pursuant" to a separate agreement, reference considered surplusage and the note negotiable); *Salomonsky v. Kelly*, 232 Va. 261, 349 S.E.2d 358 (1986) (where principal sum payable "as set forth" in a separate agreement, all the essential terms did not appear on the face of the instrument and the note was nonnegotiable).

The commercial market requires a self-contained instrument for negotiability so that a stranger to the original transaction will be fully apprised of its terms and will not be disadvantaged by terms not ascertainable from the instrument itself. For example, interest payable at the "current rate" leaves a holder subject to claims that the current rate was established by one bank rather than another and would disadvantage a stranger to the original transaction.

The rate which is stated in the notes in this case, however, does not similarly disadvantage a stranger to the original agreement. Anyone coming into possession could immediately ascertain the terms of the notes; interest payable at three percent above the prime rate established by the Chase Manhattan Bank of New York City. This is a third-party objective standard which is recognized as such by the commercial market. The rate can be determined by a telephone call to the bank or from published lists obtained on request. *Associated East Mortgage Co. v. Highland Park, Inc.*, 172 Conn. 395, 406, 374 A.2d 1070, 1076 (1977); *see*

*Constitution Bank and Trust Company* v. *Robinson,* 179 Conn. 232, 425 A.2d 1268 (1979).

Accordingly, I believe these notes are negotiable under the Code and I would affirm the decision below.