## Richmond

### Donald P. Becker, et al.

### v.

### National Bank and Trust Company

December 4, 1981.

Record No. 790205.

Present: Carrico, C.J., Harrison, Poff, Compton, Thompson, and Stephenson, JJ.

*John C. Lowe (J. Lloyd Snook, III; Lowe and Gordon, Ltd.,* on brief), for appellants.

*Robert E. Eicher (Frederick T. Gray; Evelyn G. Skaltsounis; Williams, Mullen, Christian, Pollard & Gray,* on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

In this case involving the Uniform Commercial Code, National Bank and Trust Company (the Bank) sought recovery below on six promissory notes executed respectively by each of six couples (collectively, the Makers).[1] The Bank held the notes as collateral for a loan made to United Leasing Corporation (United) and instituted the present action against the Makers upon United's default.

The parties agreed to submit the case to the trial court upon discovery depositions and pretrial briefs. Ruling that the Bank was a holder in due course entitled to recover on the notes, the

---

[1] The Makers are Donald P. Becker and Patricia A. Becker, Harold F. Young and Mary T. Young, Frederick S. Vines and Marguerite B. Vines, David Yashon and Myrna D. Yashon, Walter W. Whisler and Jeanette C. Whisler, and John A. Jane and Noella Jane.

court entered a separate judgment against each set of makers.[2] We granted the Makers an appeal.

The record shows that, in 1972, Dr. Sven Ebbesson induced six of his colleagues in the medical field to join him in a cattle venture. The venture consisted of a corporation known as Solhem Farm, Inc., with Ebbesson as president and major shareholder, and a partnership known as Polled Exotics Limited Partnership (Polled), with Ebbesson as general partner and his six colleagues as limited partners.

To commence the business, Ebbesson negotiated with Edward Shield, president of United, to have United purchase cattle and lease them to Polled. As collateral to insure performance of the lease obligations, Polled transferred to United seven promissory notes, each executed by a different partner and his wife and made payable to the order of Polled.[3] The transfer to United was evidenced by a separate assignment agreement and not by any writing entered upon, or attached to, the notes themselves.

Shield, on behalf of United, negotiated with the Bank for a loan to purchase the cattle to be leased to Polled. As collateral, United transferred to the Bank the cattle lease executed by Polled and the seven promissory notes United had received from Polled.

After the Bank's loan to United was closed, the cattle operation commenced and the Makers began paying United the annual installments due on their notes. Ultimately, the cattle venture suffered financial reverses, and the Makers undertook an investigation of the operation. Thereafter, the Makers ceased paying the notes and instituted a fraud action against Polled in the United States District Court for the Western District of Virginia. Finding that the notes had been procured from the Makers by fraud, the District Court declared the notes void *ab initio* as between the Makers and Polled. The Bank was not a party to this proceeding.[4]

Following cessation of the Makers' payments, United defaulted on its loan obligation to the Bank. The Bank obtained judgment against United for the balance due on the debt and, failing to se-

---

[2] The amounts of the judgments ranged from $14,874.66 to $20,525.15.

[3] The note executed by Ebbesson and his wife is not involved in this appeal. The others who executed promissory notes are listed in footnote 1.

[4] The Makers state in their brief that the United States Bankruptcy Court for the Western District of Virginia found that United had procured the cattle lease from Polled by fraud. The Makers state also that the Bank was not a party to this proceeding.

cure satisfaction of that judgment, brought the present action against the Makers.

On appeal, the focal point of the controversy between the parties is a provision contained in each of the notes executed by the Makers. The provision reads:

> The makers of this Note agree that Polled Exotics Limited Partnership, or its assignees, may freely assign or negotiate this Note in whole or in part from time to time without notice to the makers; however, if the makers of this Note are given notice of such an assignment or negotiation, the makers agree to acknowledge receipt thereof in writing.

Section 1-102(3) of the Uniform Commercial Code (Va. Code § 8.1-102(3)) provides that "[t]he effect of provisions of this act may be varied by agreement." The Official Comment to this section reads in part:

> 2. Subsection (3) states affirmatively at the outset that freedom of contract is a principle of the Code: "the effect" of its provisions may be varied by "agreement." The meaning of the statute itself must be found in its text, including its definitions, and in appropriate extrinsic aids; it cannot be varied by agreement. . . . Thus private parties cannot make an instrument negotiable within the meaning of Article 3 except as provided in Section 3-104; nor can they change the meaning of such terms as "bona fide purchaser," "holder in due course," or "due negotiation," as used in this Act. But an agreement can change the legal consequences which would otherwise flow from the provisions of the Act.

In reaching the conclusion that the Bank was a holder in due course not subject to the fraud defenses of the Makers, the trial court held that the parties had "contract[ed] as to the effect of the Commercial Code's provisions" by providing for the assignment of the notes "without suffering the usual effect of loss of negotiability." Thus, the court found, United had the "capacity to negotiate the notes" to the extent that the Bank became a holder in due course.

The Makers contend that by allowing the disputed provision of the notes to stand, the trial court has permitted the parties to vary the meaning of such U.C.C. terms as "due negotiation" and

"holder in due course." This is the very sort of change that the U.C.C. prohibits, the Makers insist, and, hence, the trial court's findings are erroneous.

On the other hand, the Bank contends that the disputed provision did not change "any concept or definition" of the U.C.C. The Bank argues that the "language of the Notes only varied the legal consequence of lost negotiability which would otherwise have attended an assignment of the Notes to United Leasing." The Bank maintains that, since this type of variance is allowed by the U.C.C., the trial court properly held United was authorized to negotiate the notes so as to permit the Bank to become a holder in due course.

■■■ We agree with the Bank that by allowing United, a mere assignee, to negotiate the notes, the disputed provision varied the legal consequences ordinarily attending an assignment. We do not agree, however, that only legal consequences were altered; we believe the provision also changed concepts or definitions of the U.C.C. contrary to the previously quoted Official Comment.

In pertinent part, § 3-202 of the U.C.C. provides:

(1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery.

(2) An indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof.

In § 1-201(20), a holder is defined as "a person who is in possession of . . . an instrument . . . issued or indorsed to him or to his order or to bearer or in blank." And, in § 3-302, a holder in due course is defined as a "holder who takes the instrument" under specified conditions.

These sections provide that, before a transferee of a promissory note can become a holder in due course, he must first qualify as a holder. A transferee may become a holder of order paper only by "negotiation," that is, by indorsement and delivery, and the indorsement must be by or on behalf of a person who is himself a holder.

Without the disputed provision, it is clear that, because United took the notes by mere assignment and not through the indorsement of Polled, United was not a holder. Thus, United could not "negotiate" the notes so as to permit its transferee, the Bank, to qualify as a holder. Therefore, to the extent that the disputed provision purported to authorize United, as a mere assignee, to negotiate the notes, the provision necessarily changed the meaning of the terms "holder" and "due negotiation" and, hence, of the term "holder in due course."

When the provision is given its obvious import relative to the order paper in question, it attempts to equate a "holder" with a mere possessor and to make "due negotiation" synonymous with delivery accompanied only by assignment. Correspondingly, the provision attempts to convert the meaning of "holder in due course" to one who possesses order paper by assignment. But the U.C.C. does not permit this sort of alteration of the meaning of the inviolable terms "due negotiation" and "holder in due course."

We hold, therefore, that the judgments entered against the Makers are erroneous. Accordingly, we will reverse the judgments and remand the case for further proceedings not inconsistent with the views expressed in this opinion.

*Reversed and remanded.*