CONSOLIDATED ALUMINUM CORPORATION, Appellant,

v.

BANK OF VIRGINIA and Graf-Comm., Inc., Appellees.

No. 82–1676.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 11, 1983.

Decided April 4, 1983.

Rehearing and Rehearing En Banc Denied May 13, 1983.

David F. Albright, Baltimore, Md. (Richard M. Kremen, William L. Hallam, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellant.

Donald E. Sharpe, Baltimore, Md. (Karen L. Myers Zauner, Piper & Marbury, Baltimore, Md., on brief), for appellees.

Before HALL, MURNAGHAN and SPROUSE, Circuit Judges.

MURNAGHAN, Circuit Judge:

The question presented here is a narrow one of commercial law. Consolidated Aluminum Corporation contracted to sell merchandise to Graf-Comm, Inc. Previous difficulties over payment and the fact that Consolidated had had experience of Graf-Comm's prior bankruptcy reorganization, resulted in Consolidated's requiring security for payment before it would ship goods sold to Graf-Comm. The security took the form of a letter of credit issued by the Bank of Virginia, by which the Bank undertook to honor a purchase price draft in an amount up to $35,000. That sum was to cover the cost of the goods.[1] The original expiration date of the letter of credit was June 29, 1979. Following four extensions, of which the Bank instigated at least one, the expiration date was fixed as April 7, 1980.

Consolidated had sent merchandise to Graf-Comm in February, 1980; still concerned about Graf-Comm's ability to pay, Consolidated inquired in mid-March of the Bank of Virginia about the possibility of further extension of the expiration date beyond April 7, 1980. The bank's response was unclear as to whether it would agree to an extension.[2] No extension in fact occurred.

On April 2, 1980 Consolidated mailed the draft for $34,762.41 and accompanying certificate of shipment needed to assure application of the letter of credit to payment of the bill of goods. That communication by mail did not, however, reach the bank until April 11, 1980, four days after the expiration date of April 7, 1980. It is undisputed that the letter of credit was irrevocable by the bank until its expiration date of April 7, 1980.

The district judge determined that Consolidated acted prudently and diligently and that, therefore, the cause of the delay should be laid not at its door but at the portal of the United States Postal Service. The case comes down simply, therefore, to the question of who bears the risk of late presentment in such circumstances, whether the bank, or the party seeking to avail itself of the security of the letter of credit. We have to decide more specifically whether reasonable use and reliance upon the mails by a letter of credit beneficiary, which results, nevertheless, in a failure strictly to comply with the applicable expiration date, will excuse precise adherence to the requirement of timeliness.

Although letters of credit are governed by particular provisions of the Uniform Commercial Code (UCC), Virginia[3] has ex-

---

1. The merchandise cost $34,762.41.

2. It appears from the record that the bank had, in fact, already decided not to grant a further extension. In a conversation of April 2, 1980 between a representative of Consolidated and a representative of the bank, it was represented that the bank had still not made a decision. However, it advised Consolidated "to protect [its] own interest."

 Obviously the bank had until April 7th to change its mind, or finally to make up its mind. An expression of indecision provided as much warning as a definite "we-will-not-extend" statement that Consolidated could not count on the letter of credit beyond April 7, 1980.

3. Subject-matter jurisdiction in this case is based upon diversity of citizenship, therefore the forum's conflict of law rules apply. *See Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The choice of law rules of the State of Maryland are, thus, applicable.

 As the Court recognized in *Keco Industries, Inc. v. ACF Industries, Inc.,* 316 F.2d 513, 514 (4th Cir.1963), the Maryland rule is that "[t]he law of the place of contracting governs matters bearing upon the execution, interpretation and validity of the contract but matters arising in connection with performance of the contract are governed by the place of performance, the place where the contract by its terms is to be performed." The letter of credit issued in this case required that the draft and documents be presented "at the counters" of the Bank of Virginia in Richmond, Virginia. The place of

pressly provided for variance by agreement.[4] *See* UCC § 1–102(3) (Va.Code § 8.1–102(3)) ("[t]he effect of the provisions of this act may be varied by agreement"). *Cf. Becker v. National Bank & Trust Co.,* 222 Va. 716, 719–20, 284 S.E.2d 793, 794–95 (1981) (recognizing that "freedom of contract is a principle of the Code" and that its provisions may be varied by agreement of the parties). The parties patently displayed awareness of their right to vary the terms of the security agreement, in that the terms of the letter of credit provided that it was subject to the Uniform Customs and Practice for Documentary Credits (1974 Revision) International Chamber of Commerce (Brochure No. 290).

 That arbiter of mercantile practice requires strict compliance with all the terms and conditions of the letter of credit.[5] Uniform Customs, Article 3 ("[a]n irrevocable credit constitutes a definite understanding of the issuing bank, provided that the terms and conditions of the credit are complied with"). It further provides in Article 10:

> *Banks assume no liability or responsibility for the consequences arising out of delay and/or loss in transit of any messages, letters or documents,* or for delay, mutilation or other errors arising in the transmission of cables, telegrams or telex. Banks assume no liability or responsibility for errors in translation or interpretation of technical terms, and reserve the

right to transmit credit terms without translating them.

(Emphasis supplied).

Article 11 is also relevant:

> Banks assume no liability or responsibility for consequences arising out of the interruption of their business by acts of God, riots, civil commotions, insurrections, wars or any other causes beyond their control or by any strikes or lockouts. Unless specifically authorized, banks will not effect payment, acceptance or negotiation *after* expiration, under credits expiring during such interruption of business.

(Emphasis supplied).

The case as argued to us has presented an admirable display of talent by counsel in attempting to apply and to rebut application of Section 3–511(1) of the UCC, which excuses late presentment of a negotiable instrument caused by factors beyond the control of the presenter. The matter was similarly presented to and addressed by the able district judge who wrote an enlightened and exhaustive opinion concluding that April 7, 1980 was and remained the expiration date, because the specific modifying language here employed by the parties, incorporated into the understanding by the Uniform Customs and Practice for Documentary Credits, took precedence over a general provision. We affirm for the reasons expressed in that opinion. *Consolidated Aluminum Corporation v. Bank of Virginia,* 544 F.Supp. 386 (D.Md.1982).[6]

AFFIRMED.

performance is Virginia, and therefore the law of Virginia governs resolution of the issue here presented.

4. Virginia has adopted in their entirety all provisions of the UCC that are relevant to the instant case. Va.Code §§ 8.1–101 to 8.11–108. Accordingly, the applicable statute will be cited only as the UCC.

5. Indeed, the law is well-established that a beneficiary must strictly comply with terms of the letter of credit generally. *See Insurance Co. of North America v. Heritage Bank, N.A.,* 595 F.2d 171 (3d Cir.1979); *Courtaulds North America, Inc. v. North Carolina National Bank,* 528 F.2d 802 (4th Cir.1976).

6. We would only observe that Consolidated, in its zeal, may have sought to extend beyond its

proper limits the rule excusing late presentment of a negotiable instrument caused by factors beyond the control of the presenter. UCC § 3–511(1). *E.g., Second National Bank of Toledo v. M. Samuel & Sons,* 12 F.2d 963 (2d Cir.1926), *cert. denied,* 273 U.S. 720, 47 S.Ct. 110, 71 L.Ed. 857 (1926) (a case preceding adoption of the UCC). Consolidated, in making its contentions, has urged upon us the consideration that Article 3 of the UCC applicable to negotiable instruments controls letter of credit transactions "to the extent negotiable instruments are involved." UCC § 5–112, Official Comment 4. However, that is not, as Consolidated urges, a statement that a letter of credit is a negotiable instrument, or has all the properties of a negotiable instrument. The letter of credit simply was not a negotiable instrument (*see, e.g., Shaffer v. Brooklyn Garden Apts.,*

311 Minn. 452, 250 N.W.2d 172 (1977)), and was not converted into one by the Code statement. *See generally* Harfield, LETTERS OF CREDIT 79–80 (1980) ("The distinction between a letter of credit and a negotiable instrument is important. A letter of credit is not a negotiable instrument."). On the contrary, the statement merely means that where, as here, the draft for which the letter of credit affords security has the characteristics of a negotiable instrument, under the applicable Negotiable Instruments Article, the draft should continue to be accorded negotiable instruments treatment, regardless of its coupling with the letter of credit. However, the case before us is one concerned exclusively with the credit aspects, that is with the letter of credit, itself. It was the letter of credit which had to be construed, not the draft for which it afforded security.