**BANKERS TRUST (DELAWARE),**
Plaintiff,

v.

**236 BELTWAY INVESTMENT,**
et al., Defendant.

Civ. A. No. 94–518–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 28, 1994.

Kintner, Plotkin & Kahn, Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this case, two general partners of a limited partnership seek to avoid personal liability for a debt of the partnership on the ground that the note evidencing the debt should be reformed to include a non-recourse provision. According to the general partners, the partnership and the lending bank inadvertently omitted the non-recourse provision, and this Court should reform the note to correct this mutual mistake. The noteholder here seeks summary judgment on the ground that it is a holder in due course of the note, which is a negotiable instrument, from which it follows that the noteholder is not subject to various defenses to the note, including the general partners' non-recourse defense. For the reasons stated herein, summary judgment for the noteholder is inappropriate because the partnership's note is not a negotiable instrument, and there is a genuine issue of material fact as to whether a mutual mistake occurred.

### I

Plaintiff, Bankers Trust (Delaware) (hereinafter "Bankers Trust"), is a Delaware banking corporation with its principal place of business in Wilmington, Delaware. An affiliate of Bankers Trust, Bankers Trust Company of New York ("BTC"), also plays a role in this matter. BTC is a New York banking firm with its principal place of business in California. Defendants in this matter are 236 Beltway Investment, a Virginia limited partnership (hereinafter "the partnership"), and two general partners, Joseph M. Della Ratta and John C. Webb ("the partners").[1]

In 1977, the partnership borrowed $2.5 million from First National Bank of Maryland ("the Note"), secured by a first deed of trust on a parcel of commercial property. The Note paid a floating rate of interest, set each month at the greater of (i) two percent

Michael Joseph Klisch, McGuire, Woods, Battle & Boothe, Alexandria, VA, for plaintiff.

John H. Rust, Jr., Rust, Rust & Silver, Fairfax, VA and H. Van Sinclair, Arent, Fox,

---

1. The action originally named a third general partner, Albert I. Kassabian, as defendant. The parties consented to an order of dismissal of the action as to Kassabian on August 4, 1994.

above First National Bank of Maryland's "prime rate of interest" or (ii) two percent above "the prevailing rate on 90–day dealer commercial paper." Although the parties dispute whether the Note was originally a recourse debt, this dispute is not material to the resolution of the issues at bar.

In 1979, following construction on the property, the partnership sought permanent financing for the project. Strouse Greenberg Financial Corporation, a mortgage broker, arranged the financing from Philadelphia Savings Fund Society ("PSFS"). Rather than entering into a new loan agreement, the parties agreed that First National Bank of Maryland would assign the original Note and deed of trust to PSFS. On the date of the assignment, July 10, 1979, the partnership and PSFS also entered into agreements ("the Modification Agreement" and "the Allonge"),[2] amending the Note and deed of trust. The parties increased the principal amount of the borrowing to $2.7 million and extended the duration of the loan. In addition, the parties eliminated the variable interest rate in favor of a 10% fixed rate. This rate was subject to change during the twenty-four month period following July 10, 1979 in the event the partnership were to request a change and PSFS were to agree. In that event, the partnership would pay a $27,000 fee and PSFS would then reset the interest rate to its "then current interest rate quoted for similar lending opportunities." This provision was never invoked; the partnership never requested that the interest rate be reset.

The partners contend that all parties to the assignment and modification agreed that the loan would henceforth be non-recourse, yet neither the Allonge nor the Modification Agreement mentions this. The central dispute in this case is whether the omission of the non-recourse term was a mutual mistake of the parties, an inadvertent error that occurred in the process of reducing their agreement to writing.

PSFS subsequently changed its name to Meritor Savings Bank ("Meritor") in April 1986. The partnership obtained a second refinancing on the project in 1986, borrowing yet another $1.6 million from Meritor secured by a second deed of trust. All parties agree that this second mortgage is non-recourse.

Thereafter, Meritor formed a securitized pool of commercial mortgages, and sold interests in the pool to investors, pursuant to a Pooling and Servicing Agreement of December 1, 1987 ("the Pooling Agreement"). Through this transaction, the investors essentially purchased from Meritor the future stream of principal and interest payments on 141 commercial mortgages. Meritor first transferred the mortgages to its wholly owned subsidiary, Meritor Mortgage Securities Corporation ("MMSC"). MMSC in turn transferred the mortgages to Bankers Trust and, in exchange, Bankers Trust delivered certificates to MMSC which represented ownership shares of the mortgage pool. MMSC then sold these certificates to the public pursuant to a registration statement filed with the SEC on December 10, 1987 ("the Registration Statement"). The investors acquired legal title to the mortgages, while Bankers Trust held beneficial title on their behalf as trustee. In addition, the Pooling Agreement provided that Meritor would act as servicer of the mortgages, collecting the payments of principal and interest from the borrowers, and passing the money to the trustee for the investors. In June 1993, BTC took over as servicer under the Pooling Agreement.

■ The partnership made payments on the Note until December 1992. After that, the payments stopped. The unpaid principal balance is now $2,748,093.22, with accrued interest of $477,862.96 and late charges of $137,404.66 through August 18, 1994. Bankers Trust commenced this action on the Note to recover these amounts from the partnership and the individual general partners.

---

**2.** An "allonge" is defined as "[a] piece of paper annexed to a bill of exchange or promissory note, on which to write endorsements for which there is no room on the instrument itself." BLACK'S LAW DICTIONARY 70 (5th ed. 1979). In practice, allonges have come to be used for more than indorsements. *See, e.g., In re Nova Real Estate Investment,* 23 B.R. 62, 73 (Bankr.E.D.Va.1982) (allonge used to amend construction loan to increase amount borrowed).

The partnership filed a voluntary bankruptcy petition on August 17, 1994 and, as a result, the partnership is protected by the automatic stay of 11 U.S.C. § 362. Absent extraordinary circumstances not present here, the stay does not protect the individual general partners. *See Patton v. Bearden,* 8 F.3d 343, 348 (6th Cir.1993). At issue, then, is whether Bankers Trust may enforce the Note against the partners.

## II

At the threshold, the partners attack the capacity of Bankers Trust to bring this action.[3] The partners argue that BTC, not Bankers Trust, is the proper entity to sue on the Note. The answer to this dispute must be found in the Pooling Agreement, which defines the authority of the trustee and the servicer, and creates distinct roles for them.

Under the agreement, the servicer administers the mortgages, collecting payments from the borrowers and foreclosing on mortgages in default. Pooling Agreement §§ 6.01, 6.08. The servicer must then transfer all collected monies to the trustee. *Id.* § 6.02(c). Article VIII of the Pooling Agreement provides that the trustee will "demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Agreement." *Id.* § 8.01. The only payments expressly "payable to or receivable by" the trustee under the agreement are the payments from the servicer. Thus, under the agreement, it is the servicer, acting for the trustee, that collects and receives the moneys due under the mortgages.

Nothing in the Pooling Agreement specifically addresses which entity is entitled to seek a personal judgment against a mortgagor in the event of a mortgage default. Yet, certain provisions point persuasively to the conclusion that the trustee may, as here, maintain such a suit. The trustee, not the servicer, has the "entire right, title and interest in and to the assets comprising the Pool, including the principal and interest received or receivable with respect to the mortgage loan." *Id.* § 2.01(a). It follows, therefore, that the trustee, as owner of the moneys due under the mortgages, has the right to sue for deficiencies. To be sure, the servicer, as receiver and collector of moneys due under the mortgages, may also have standing to sue for deficiencies.[4] Nothing in the agreement limits standing to sue to one party, either the trustee or the servicer. Its terms support standing for both, especially given the agreement's apparent purpose to ensure that moneys due under the mortgages are recovered, through legal action if necessary.[5] Thus, the fact that BTC, as receiver, could have brought this action on Bankers Trust's behalf does not preclude Bankers Trust from doing so in its own name, as owner of the moneys due.

## III

The next issue for resolution is whether Bankers Trust is, as it contends, a holder in due course of a negotiable instrument, namely the Note. If so, the partners' reformation defense, however factually valid, fails under Virginia law[6] because Bankers Trust, as a holder in due course of a negotiable instrument, takes the Note free of most

---

3. The original complaint in this matter was brought in the name of "Bankers Trust Company (Delaware)," though no such entity exists. The plaintiffs sought leave to amend the complaint to name BTC, the servicer, as plaintiff. The defendants opposed this amendment as a disingenuous attempt to change the plaintiff from the trustee to the servicer. Plaintiff's counsel conceded that the original plaintiff was meant to be Bankers Trust, the pool trustee, and the parties agreed to an amendment naming that entity as plaintiff.

4. Under the agreement, the servicer explicitly does so "on behalf of the Trustee." Pooling Agreement § 6.01.

5. The Pooling Agreement must be interpreted in light of the purposes of the parties to it, Meritor and Bankers Trust. *See Seaboard Air Line Railroad Co. v. Richmond–Petersburg Turnpike Authority,* 202 Va. 1029, 121 S.E.2d 499, 503 (1961); *Yukon Pocahontas Coal Co. v. Ratliff,* 181 Va. 195, 24 S.E.2d 559, 562 (1943).

6. The Note provides that "[t]he validity and construction of this Note and all matters pertaining thereto are to be determined according to the laws of the Commonwealth of Virginia."

contract defenses. Va.Code § 8.3–305 (repealed 1993).[7] Specifically, a holder in due course is subject to a limited set of defenses enumerated in the statute, and mutual mistake is not among these. Thus, if the Note is a negotiable instrument, and Bankers Trust is a holder in due course, the partners' allegations of mutual mistake are unavailing.

■ Under Virginia law in effect at the time, a writing qualifying as a negotiable instrument must:

(a) be signed by the maker or drawer; and

(b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this title; and

(c) be payable on demand or at a definite time; and

(d) be payable to order or to bearer.

Va.Code § 8.3–104 (repealed 1993). While the partnership's Note plainly meets some of these requirements, it is equally plain that it does not meet all of them. In particular, the Note, by virtue of its variable interest rate, does not promise payment of a "sum certain." Nor is a different conclusion warranted on the ground that in 1979, the Allonge eliminated the variable rate in favor of a fixed 10% rate. Even with this change, the Note still does not promise payment of a sum certain because (i) the Note itself must satisfy the requirements of negotiability, and cannot depend on a separate agreement such as the Allonge to furnish any of the requisite elements of negotiability, and (ii) even considered together, the Note and the Allonge do not contain a promise to pay a sum certain, because the Allonge's fixed rate is subject to change at the mutual election of the partnership and the holder of the Note.

■ Virginia's statute in effect prior to 1993 stated that "[a] separate agreement

does not affect the negotiability of an instrument." Va.Code § 8.3–119(2) (repealed 1993). This provision ensured that terms contained in a separate writing would not destroy the negotiability of a note that otherwise met the Code's requirements. Va.Code § 8.3–119, official comment 5 (repealed 1993). In other words, the negotiability of the instrument must turn only on what is within the four corners of the instrument itself. Just as separate agreements cannot destroy an instrument's negotiability, neither can they create negotiability. *First State Bank at Gallup v. Clark,* 91 N.M. 117, 119, 570 P.2d 1144, 1146–47 (1977); *Walls v. Morris Chevrolet, Inc.,* 515 P.2d 1405, 1406–07 (Okla. Ct.App.1973). Virginia courts have repeatedly endorsed and strictly applied this "four corners" rule. As the Supreme Court of Virginia stated in *Taylor v. Roeder:*

> We conclude that the drafters of the Uniform Commercial Code adopted criteria of negotiability intended to exclude an instrument which requires reference to any source outside the instrument itself in order to ascertain the amount due, subject only to the exceptions specifically provided for by the U.C.C.

234 Va. 99, 360 S.E.2d 191, 194 (1987); *see also Salomonsky v. Kelly,* 232 Va. 261, 349 S.E.2d 358, 360 (1986). The "four corners" rule, applied here, compels the conclusion that the Allonge is a separate agreement, which therefore cannot rescue the Note from its congenital non-negotiability.

■ Yet Bankers Trust contends that the Allonge is not really a "separate agreement" because the Allonge and the Note together constitute one instrument. In support, Bankers Trust points to the one section of the former statute that did allow additional pages to be added to a note and treated as part of that instrument. That section required that "[a]n indorsement must be written by or on behalf of the holder and on the

7. This case is complicated somewhat by the repeal of Virginia's version of Uniform Commercial Code Article 3, Va.Code § 8.3, as of January 1, 1993. While the new statute, Va.Code § 8.3A, is generally similar to the old law, there are some significant differences. For this reason, the Supreme Court of Virginia has been careful to apply the repealed statute to cases where, as here, the "dispute" or "controversy" took place before 1993. *Woo v. Smart,* 247 Va. 365, 442 S.E.2d 690, 693 (1994); *Fairfax Bank & Trust Co. v. Crestar Bank,* 247 Va. 356, 442 S.E.2d 651, 653 (1994); *Strickler v. Marx,* 246 Va. 384, 436 S.E.2d 447, 449 (1993). This opinion accordingly applies Virginia's former statute.

instrument or on a paper so firmly affixed thereto as to become a part thereof." Va. Code § 8.3–202(2) (repealed 1993). Importantly, however, this provision sanctioned only the addition of indorsements to an instrument. The Allonge purports to do far more than merely add indorsements; it significantly alters the rights and obligations of the parties under the original Note. Thus, no matter how firmly the Allonge was affixed to the Note,[8] it is undeniably a distinct, self-contained contract entered two years after the Note's execution. The language of the Allonge itself reflects this, as its first sentence states that "[t]he attached Deed of Trust Note has been modified by Agreement dated July 10, 1979, as follows." The purpose of the "four corners" rule and the Code's rule against separate agreements is to enable transferees to accept an instrument without having to track down and inspect any document other than the instrument itself. *Taylor*, 360 S.E.2d at 194. And, of course, nothing on the face of the Note even alludes to the existence of the Allonge. In sum, because the Allonge must be regarded as a separate agreement from the Note, Virginia law prevents the Allonge from curing the Note's non-negotiability.

 Even if Bankers Trust were entitled to rely on the Allonge, the conclusion of non-negotiability would still obtain because it, too, contains no promise to pay a "sum certain." Instead, the Allonge provides that the partnership will pay a fixed interest rate

of 10%, *unless* the partnership requests, and the noteholder agrees, to reset the interest rate to "the Noteholder's then current interest rate quoted for similar lending opportunities." [9] Virginia, in keeping with its strict "four corners" approach to negotiability, was among those states that narrowly defined "sum certain" to exclude any instrument whose interest rate could not be determined solely from the instrument's face. In *Taylor v. Roeder*, 360 S.E.2d 191 (Va.1987), the Supreme Court of Virginia held that a note paying interest at "3% over Chase Manhattan prime" was not for a "sum certain" because the interest rate could only be determined from sources other than the Note. Virginia law at that time provided that:

(1) The sum payable is a sum certain even though it is to be paid

(a) with stated interest, a stated rate of interest or by stated installments; or

(b) with stated different rates of interest before and after default or a specified date; or

(c) with a stated discount or addition if paid before or after the date fixed for payment; or

(d) with exchange or less exchange, whether at a fixed rate or at the current rate; or

(e) with costs of collection or an attorney's fee or both upon default.

Va.Code § 8.3–106 (repealed 1993). The court in *Taylor* concluded that these were

---

8. Bankers Trust emphasizes that the Allonge has always been attached to the Note with a staple. Because the Allonge is a separate agreement to which § 8.3–202(2) does not apply, it is unnecessary for this Court to wade into the controversy over whether a staple sufficiently "affixes" an indorsement to a Note. *See* Dubner, *The Case of the $19 Million Staple*, 6 Cooley L.Rev. 37 (1989).

9. The Allonge provides, in pertinent part, that:

2. The interest rate on the principal indebtedness shall be Ten Percent (10%) per annum from the date of this Allonge.

PROVIDED, HOWEVER, anything in the attached Note or Deed of Trust securing the same to the contrary notwithstanding, for a period of Twenty–Four (24) months from the date of this Allonge, the makers and endorsers hereof shall have the right to request that the interest rate be reset to the Noteholder's then

current interest rate quoted for similar lending opportunities. The request may be exercised by delivering or mailing written notice to the Noteholder, who shall have thirty (30) days from receipt of same to respond. The notice must be accompanied by a check in the amount of Twenty–Seven Thousand Dollars ($27,000.00), which fee shall be earned by the Noteholder if the request is implemented.

The makers and endorsers acknowledge that the Noteholder will not be obligated to a) reset the interest rate; b) reset the interest rate more than one time if reset initially; c) reset the interest rate if any default shall have occurred and be continuing in the performance of any obligations in the loan documents, or d) reset the interest rate if the Mortgaged Property has a then physical occupancy of less than Eighty Percent (80%) with rentals producing a rent roll of less than Four Hundred Eighty Thousand Dollars ($480,000.00).

the exclusive exceptions to the general rule that the interest rate must be ascertainable from the face of the instrument itself "without reference to any outside source." 360 S.E.2d at 194 (quoting Va.Code § 8.3–106, official comment 1 (repealed 1993)).[10]

The interest rate here could not be determined without information extrinsic to the Note and the Allonge. To ascertain whether the 10% fixed rate had been displaced, one would need to know whether the partnership had tendered the $27,000 fee and made a timely request that the rate be modified, and whether the noteholder had elected to accept the request. Further, one would need to ascertain the new interest rate, a figure to be set according to the Noteholder's then current rate for similar loans. Manifestly, therefore, the Note does not meet *Taylor*'s requirement that the rate "be found within the 'four corners' of the Note." 360 S.E.2d at 194.[11]

Nor does the contingent nature of the Note's interest provision save the Note from non-negotiability. The court in *Centerre Bank of Branson v. Campbell*, 744 S.W.2d 490, 492 (Mo.Ct.App.1988), found that a note was not negotiable because of a similarly non-binding provision. There, Campbell borrowed from the Strand Investment Company, and signed a promissory note with a fixed

rate of 14%. The Note also stated that "Interest may vary with bank rates charged to Strand," but the Note contained no other explanation as to how or when the interest rate might change. On these facts, the court held that the Note contained no promise to pay a "sum certain," explaining that:

> Even if one assumes that Strand would elect not to vary the interest charged if interest rates charged Strand by banks changed, a holder of the note would have to investigate such facts before determining the amount due on the note at any time of payment.

*Id.* at 498. Likewise, even though the provision in the Allonge binds neither party in any way, it would reasonably raise a question in the mind of a person examining the Note concerning whether the 10% fixed rate was still effective. Investigation beyond the four corners of the Note is required to settle the question. As a result, the rationale of *Taylor* applies, and the Note cannot qualify as negotiable.[12]

## IV

The partners also argue on several grounds that Bankers Trust does not qualify as a holder in due course under Virginia law. In Virginia at the time, a holder in due course was a person "in possession of . . . an

---

**10.** Virginia amended its statute in 1988 to include most variable rate instruments:

> A rate of interest that cannot be calculated by looking only to the instrument is "a stated rate of interest" in subsection (1) of this section if the rate is readily ascertainable by a reference in the instrument to a published statute, regulation, rule of court, generally accepted commercial or financial index, compendium of interest rates, or announced or established rate of a named financial institution.

Va.Code § 8.3–106(2) (repealed 1993). Even this amendment would not save the Allonge because the reference to the noteholder's current interest rate for "similar lending opportunities" is not an "announced or established rate of a named financial institution." *Id.* In addition, this circuit has held that the amendment is not retroactive and that notes executed prior to 1988 are not negotiable if the rate cannot be determined from the note itself. *Resolution Trust Corp. v. Maplewood Investments*, 31 F.3d 1276, 1289 (4th Cir.1994).

**11.** The Note here is different from the instrument in *Taylor* in one respect. Unless the partnership requested that the interest rate be reset, and the

noteholder agreed, the fixed 10% rate would remain in effect. Because the provision was contingent on the acquiescence of *both* parties, it did not grant anyone rights or options they did not otherwise have. Regardless of the provision, the partnership and the noteholder could always have agreed later to alter the interest rate, setting it at the noteholder's then current rate or at some other rate, for a $27,000 fee or a different amount. The parties would simply have to execute another allonge or modification agreement. In this sense then, *every* note requires extrinsic knowledge to determine its interest rate, namely the knowledge that the parties have not superseded the note with an amendment or new contract.

**12.** This conclusion alone is sufficient to scuttle Bankers Trust's holder in due course argument. Even so, principles of good judicial husbandry support the Court's consideration of the other questions raised by the motion for summary judgment.

instrument ... issued or indorsed to him," [13] who takes the instrument:

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

Va.Code § 8.3–302 (repealed 1993). But for the fact that the Note is not a negotiable instrument, Bankers Trust would qualify as a holder in due course.

 The partners argue first that Bankers Trust is not a "holder" because it did not have possession of the Note. Va. Code § 8.1–201(20). After the execution of the Pooling Agreement in 1987, Bankers Trust stored the Note in the vault at the offices of its sister company, BTC. The statute sensibly recognizes that a party has constructive possession of a negotiable instrument when it is held by the .party's agent, *Crossland Savings, FSB v. Foxwood & Southern Co.*, 202 A.D.2d 544, 609 N.Y.S.2d 282, 283 (1994), or when the party otherwise can obtain the instrument on demand, *Billingsley v. Kelly*, 261 Md. 116, 274 A.2d 113, 126 (1971). Bankers Trust plainly had constructive possession of the Note at all times and therefore qualifies as a holder of the Note.

 A holder in due course also must take the instrument "for value." Va.Code § 8.3–302(1)(a) (repealed 1993). The statute provides that "[a] holder takes the instrument for value (a) to the extent that the agreed consideration has been performed ...

or (c) when he ... makes an irrevocable commitment to a third person." Va.Code § 8.3–303 (repealed 1993). The partners contend that, while the investors paid for beneficial title to the mortgages by purchasing the certificates, Bankers Trust acquired legal title to the mortgages without giving value. According to the partners' logic, there would often be no one who could qualify as a holder in due course of an instrument held in trust. The trustee has possession but does not give value; the beneficiary gives value but lacks possession.[14] It is unnecessary to decide here whether a trustee who does not give value can be a holder in due course, because in this case Bankers Trust did give value for the mortgages. The Pooling Agreement provides that "in exchange for the Original Mortgage Loans," the trustee must deliver to MMSC the "Certificates duly executed and authenticated by the Trustee in authorized denominations evidencing the entire ownership of the pool." Pooling Agreement § 2.06. MMSC received the certificates from Bankers Trust in exchange for the mortgages, and soon thereafter sold the certificates to investors in the public offering. By delivering the investment certificates to MMSC, Bankers Trust gave value for the mortgages.

 The partners have suggested that an assignee cannot be a holder in due course under Virginia law. In fact, Virginia law treats assignments no differently from other transfers. *Strickler v. Marx*, 246 Va. 384, 436 S.E.2d 447, 449–50 (1993); *Becker v. National Bank and Trust Co.*, 222 Va. 716, 284 S.E.2d 793, 795–96 (1981). An assignee

---

13. Va.Code § 8.1–201(20).

14. Virginia's courts have never directly addressed this question. In *Trustees of American Bank of Orange v. McComb*, 105 Va. 473, 54 S.E. 14 (1906), the Supreme Court of Virginia stated that a trustee may be a holder in due course if the normal statutory requirements are met. The court found that the plaintiff, the trustee of a failed bank, was a holder in due course, but the note's maker there did not argue that the trustee had not taken the note for value. *See also Taylor v. Roeder*, 234 Va. 99, 360 S.E.2d 191, 193 (1987) (avoiding question whether pension trustee was holder in due course because instrument was not negotiable). In part, this question was unlikely to arise because the statute specifically prevented an executor of an estate or a bankruptcy trustee

from becoming a holder in due course. Va.Code § 8.3–302(3)(a)–(b) (repealed 1993).

One court has adopted the partners' reasoning. In *Bryen v. Krassner*, 208 N.J.Super. 639, 506 A.2d 803 (App.Div.), *certification denied*, 105 N.J. 583, 523 A.2d 210 (1986), a debtor assigned a note to a trustee for the benefit of fifteen creditors. The court held that the creditor beneficiaries were not holders in due course because they did not possess the note. The court also held that the trustee, who did possess the note, was not a holder in due course because, among other things, he did not give value. The court refused to create "holder in due course status by combining a trustee's status as holder with his beneficiaries' payment or other giving of value." *Id.* 506 A.2d at 804.

may become a holder in due course provided the assignor properly negotiates the note by indorsement and delivery. Virginia law only prevents one who takes a Note by "mere assignment and not through indorsement" from becoming a holder in due course. *Strickler,* 436 S.E.2d at 450.

■■■ The partners also contend that Bankers Trust is not a holder in due course because it acquired the Note as part of a bulk transfer. Virginia's statute in effect at the time of the assignment provided that "[a] holder does not become a holder in due course of an instrument . . . by purchasing it as part of a bulk transaction not in regular course of business of the transferor." Va. Code § 8.3–302(3)(c) (repealed 1993). The partnership argues that Meritor made a bulk sale of mortgages in creating the securitized pool in 1987. The securitization did involve the transfer of 141 mortgages totalling $248 million in value. While the securitization may have been a large and even novel transaction, it did not amount to a bulk transaction under § 8.3–302(3)(c). The official comments to § 8.3–302 explain that:

> [Subsection (3) ] covers a few situations in which the purchaser takes the instrument under unusual circumstances which indicate that he is merely a successor in interest to the prior holder and can acquire no better rights. . . .
>
> Subsection (3)(c) applies to bulk purchases lying outside the ordinary course of business of the seller. It applies, for example, when a new partnership takes over for value all of the assets of an old one after a new member has entered the firm, or to a reorganized or consolidated corporation taking over in bulk the assets of a

predecessor. It has particular application to the purchase by one bank of a substantial part of the paper held by another bank which is threatened with insolvency and seeking to liquidate its assets.

Va.Code § 3–302, official comment 3 (repealed 1993). The Supreme Court of Virginia has adopted this narrow view of the bulk transaction exception. In *Lawton v. Walker,* 231 Va. 247, 343 S.E.2d 335 (1986), the court rejected the argument that a bulk transaction took place because "the evidence as a whole shows clearly that [the purchaser] was not taking over [seller's] entire assets in bulk under unusual circumstances indicating [purchaser] was [seller's] successor in interest." *Id.* 343 S.E.2d at 339. Here, Bankers Trust was merely an assignee of a number of mortgages. Since it did not take over the assets and liabilities of Meritor in general, the bulk transaction exception does not apply.

■■■ The partners also argue that Bankers Trust is not a holder in due course because it knew or should have known the Note was non-recourse. First, a holder in due course must take the instrument in good faith. Va.Code § 8.3–302(1)(b) (repealed 1993).[15] Second, a holder in due course must take the instrument without notice of any defense to enforcement. Va.Code § 8.3–302(1)(c) (repealed 1993). Virginia law at the time provided that the person taking the instrument must have "knowledge of the claim or defense or knowledge of such facts that his action in taking the instrument amounts to bad faith." Va.Code § 8.3–304(7) (repealed 1993).[16] Under Virginia law, these two determinations involve the same standard of subjective, actual knowledge.[17]

---

**15.** Virginia law defines good faith as "honesty in fact in the conduct or transaction concerned." Va.Code § 8.1–201(19). Bad faith requires knowing dishonesty, not merely carelessness. *Schultz v. Wills,* 126 B.R. 489, 493 (Bankr. E.D.Va.1991) (applying Virginia law).

**16.** This section of Virginia's statute was a non-uniform amendment to the Uniform Commercial Code, under which the question is a "simple test of what they actually knew, not by speculation as to what they had reason to know, or what would have aroused the suspicion of a reasonable person in their circumstances." *Schultz,* 126 B.R. at 492–93 (quoting *Hartford Accident & Indemni-*

*ty Co. v. American Express Co.,* 74 N.Y.2d 153, 544 N.Y.S.2d 573, 578, 542 N.E.2d 1090, 1095 (N.Y.Ct.App.1989)).

**17.** *See Lawton v. Walker,* 231 Va. 247, 343 S.E.2d 335, 338 (1986) (describing test for good faith as "looking to the mind of the particular holder" and not "what the state of mind of a reasonably prudent person should have been"); *Schultz,* 126 B.R. at 492–93 (noting that, under Va.Code § 8.3–304(7), whether holder had notice of defense is to "be determined by a subjective test of actual knowledge rather than an objective test").

While the burden is on Bankers Trust as the party moving for summary judgment to show that it did not have such knowledge, "the holder's burden is a slight one that will be satisfied by testimony of the holder that it had no knowledge." *Schultz v. Wills,* 126 B.R. 489, 495 (E.D.Va.1991). The burden then shifts to the partners to establish that there is a genuine issue of material fact. *Id.*

█ The partners' argument, distilled to its essence, is that Bankers Trust must have known that the partnership's debt was non-recourse when it received the Note in connection with becoming trustee of the pool in 1987, because the major documents in the deal, the Pooling Agreement and the Registration Statement, stated that all the mortgages in the pool were non-recourse. Yet, this is merely an inference about what Bankers Trust had reason to know; it is not actual knowledge as Virginia law requires.

█ In a closely related argument, the partners contend that, even if Bankers Trust is a holder in due course, it remains subject to certain defenses enumerated in statute,[18] including any "discharge of which the holder has notice when he takes the instrument." Va.Code § 8.3–305(2)(e) (repealed 1993). This objective standard, satisfied if Bankers Trust knew or should have known of the discharge,[19] is not met, for there was no reason Bankers Trust should have been aware that the partners were discharged from personal liability on the Note. The record facts reflect that Bankers Trust did not review the loan files prior to the transaction, and had no reason to fear that some of the loans might actually be recourse debt, since the additional security would enhance the mortgages' value, benefitting the investors.[20] Though Bankers Trust may have assumed, without investigation, that all the mortgages were non-recourse, it had no actual knowledge one way or the other, nor any reason to know.[21]

█ In sum, Bankers Trust would qualify as a holder in due course, if the Note were a negotiable instrument. The Note is not negotiable, however, because with or without the Allonge, it does not promise payment of a sum certain. Consequently, Bankers Trust is an assignee of an ordinary contract, and is

---

18. A holder in due course takes the instrument subject to the so-called "real defenses," listed in § 8.3–305(2), but free of the "personal defenses" in § 8.3–306. *See Village Motors, Inc. v. American Federal Savings & Loan Association,* 231 Va. 408, 345 S.E.2d 288, 289–90 (1986).

19. Because § 8.3–305(2)(e) did not specify otherwise, the Code's general definition of "notice" apparently applied. That definition provides that a holder is deemed to have notice of a fact when "he has actual knowledge of it ... or from all the facts and circumstances known to him at the time in question he has reason to know that it exists." Va.Code § 8.1–201(25).

20. Bankers Trust notes that subsequent review of the loan files has revealed that other mortgages in the pool were actually recourse loans.

21. Further, even if Bankers Trust actually believed that the Note was non-recourse, this would not amount to knowledge that a reformation defense existed or that the partners had been discharged, as the statute requires. It is one thing to believe, perhaps mistakenly, that a Note is non-recourse. It is quite another to know or have reason to know that the absence of a non-recourse term in the Note is a mutual mistake of the parties giving rise to a reformation remedy. There is no indication that Bankers Trust knew, or had reason to know, that the partners could have the Note reformed and thereby win a discharge from personal liability.

Put another way, the partners are arguing that Bankers Trust thought it was accepting a non-recourse note, and Bankers Trust should be held to that. This argument runs counter to an important purpose of Title 8.3, which is to promote the free transferability of instruments by protecting the expectations of those who accept them. Normally, the best way to protect the transferee's expectations is to ensure that the terms of the instrument will be binding. *See* Rogers, *The Myth of Negotiability,* 31 B.C.L.Rev. 265, 268–72 (1990) (describing the traditional account of the significance of negotiability). A wrinkle arises where, as here, the transferee apparently misconceived the instrument's terms, not having carefully read the instrument prior to accepting it. In the partners' view, enforcing the Note's terms in this situation would allow Bankers Trust to receive an unanticipated windfall. In fact, a key reason that Bankers Trust paid little attention to the Note's content was, presumably, that it expected to be able to enforce the Note's terms, whatever they were. Consequently, Title 8.3's purposes are served by enforcing the instrument's terms, even where the noteholder initially misapprehended them, because this reduces the costs of accepting instruments without hesitation.

**1198**

subject to the partners' mutual mistake defense.

## V

Bankers Trust argues in the alternative that summary judgment is appropriate because the partners do not present sufficient evidence of mutual mistake to warrant reformation of the Allonge and Modification Agreement.[22] This argument is scuttled by the application of settled summary judgment principles to the existing factual record.

 Summary judgment for Bankers Trust is appropriate only if there are no disputed issues of material fact regarding the existence of a mutual mistake or the presence of equities warranting reformation. *See In re Complaint of Eastern Shore Diving & Marine Services, Inc.*, 845 F.Supp. 371, 374 (E.D.Va.1994). Parol evidence is admissible to reform a contract where there is clear and convincing evidence of a mutual mistake and of the actual understanding of the parties. *United Virginia Bank v. Cleveland*, 53 B.R. 814, 817 (Bankr.E.D.Va.1985) (citing *State Farm Mutual Insurance Co. v. Miller*, 194 Va. 589, 74 S.E.2d 145, 148 (1953)). To warrant the equitable remedy of reformation, the mistake must be made by both parties. A unilateral mistake that is not known by the other party justifies neither reformation nor invalidation of the contract. *Chang v. First Colonial Savings Bank*, 242 Va. 388, 410 S.E.2d 928, 930 (1991). Because the partners seek to reform contracts that they approved, the partners' proof ultimately must

be "clear and satisfactory, leaving but little, if any doubt of the mistake." *Gibbs v. Price*, 207 Va. 448, 150 S.E.2d 551, 552 (1966) (quoting *French v. Chapman*, 88 Va. 317, 13 S.E. 479, 481 (1891)).[23] The question presented, then, is whether, on this record, a court could find clear and satisfactory evidence warranting reformation. *Overstreet v. Kentucky Central Life Insurance Co.*, 950 F.2d 931, 937 (4th Cir.1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). That a court could so find is confirmed by the following summary of record facts favoring the partners.[24]

● The partners provided affidavits from those who represented the partnership in the refinancing: Della Ratta and Webb, the general partners; Phillip C. Bowman, then the vice-president of the partnership; and C. Douglas Adams, a limited partner and the attorney who prepared the Allonge and the Modification Agreement and handled the closing. In essence, these affidavits aver that (i) lenders at that time customarily did not require personal liability for permanent financing of commercial projects with adequate tenancy and cash flow, (ii) that personal liability was not required by the lender in this instance, (iii) that all parties to the agreements intended that the loan would thereafter be non-recourse, and (iv) that the loan documents are in error to the extent that they do not reflect this intention.

● Documents written prior to the execution of the Allonge and the Modification

---

**22.** *Bankers Trust also argues that the partners have waived their mutual mistake defense by not pleading it in their answers. The partners' answers did state that "[p]laintiff's claim to relief against this defendant as a general partner is contradicted by the Note, Deed of Trust, and Modification Agreement." Furthermore, after the partners presented the allegations of mutual mistake more thoroughly in opposition to plaintiff's motion for summary judgment, Bankers Trust has had two opportunities to respond. Though the partners' defense may have crystallized only after some factual development of the case, the partners have hardly sprung their argument at the "eleventh hour" as Bankers Trust complains.*

**23.** *The applicable standard has been met before where a loan refinancing agreement improperly omitted a non-recourse provision. Resolution Trust Corp. v. Midwest Federal Savings Bank of*

*Minot*, 4 F.3d 1490, 1502 (9th Cir.1993). *In that case, the bank's commitment letter, the minutes of the bank's board of directors, and the loan form submitted to the board all indicated that the loan was to be non-recourse. The bank then sent a letter to the borrower, confirming the loan approval, but failing to mention the non-recourse term. The bank's attorney omitted the provision from the loan documents as well. Id. at 1492. The Ninth Circuit Court of Appeals affirmed the district court's conclusion that "the omission of the nonrecourse provision was the result of the parties' oversight, and not a renegotiation of the terms of the loan." Id. at 1502.*

**24.** *Because the question is whether the partners as the non-moving parties have adduced sufficient evidence to create a triable issue, no effort is made here to marshall the record evidence favoring Bankers Trust.*

Agreement reflect the parties' intention that the debt become non-recourse. These documents include a letter of March 23, 1979 from Strouse Greenberg to the partnership, summarizing PSFS's proposed terms, including "[t]he elimination of personal liability which I presume exists with your construction loan but would not be present with the PSFS"; a mortgage application submitted by the partnership to PSFS on April 3, 1979, calling for "[l]iability limited to real estate"; and a mortgage request presented soon thereafter by Strouse Greenberg to PSFS, providing for "[l]iability limited to the real estate described in the mortgage." Most significantly, the loan submission report and approval statement of April 25, 1979, signed by two officers of PSFS giving official authorization for the bank to make the loan, indicates that liability would be "Limited to Real Estate," and describes the mortgagor as "236 Beltway Investment Limited Partnership, a Virginia Limited Partnership, Joseph M. Della Ratta and John C. Webb as General Partners *without personal liability* " (emphasis added).

● The partners also produced affidavits of two individuals involved with the refinancing agreements who were not partners or employees of the partnership. F. Pearce Bradburn, a loan officer at Strouse Greenberg, was the mortgage broker who arranged the refinancing. James M. Toolan, a senior vice-president at PSFS, personally signed and approved the loan in question. Because they handled so many transactions in their work, neither specifically remembers the intended terms of the partnership's loan. Even so, both believe, on the basis of the available documentation and on the basis of their familiarity with the refinancing practices of the lender involved, that the partnership applied for a non-recourse loan, and that PSFS approved the loan on that basis.

● In several documents prepared after the 1979 refinancing, PSFS, and later Meritor, continued to describe the general partners as being without personal liability. These include several modification agreements entered between the partnership and Meritor in August 1991 and March 1992, which stated that nothing therein should "be construed as establishing any personal liability" on the general partners. Meritor also maintained

"Mortgage Premises Index Cards" consistently describing the mortgagor as the "236 Beltway Investment Limited Partnership, a Virginia Limited Partnership with Joseph M. Della Ratta and John C. Webb as general partners without personal liability."

● The Registration Statement filed by Meritor on December 10, 1987 states repeatedly that all of the loans in the pool are non-recourse. The partners provided an affidavit of F. Douglas Raymond, the attorney who represented Meritor in connection with the pool transaction, stating that the parties intended to place only non-recourse mortgages in the pool, that all of the loans were evaluated on the assumption that they were non-recourse, and that inclusion of any recourse debt in the pool was inadvertent and was ignored because it was not adverse to the interests of the investors who purchased the certificates.

From this brief recitation, it appears that record evidence favoring the partners is sufficient to create a triable issue of fact concerning reformation of the Note. Because the partnership's Note is not a negotiable instrument under Virginia law, and because there is a genuine issue of material fact as to whether reformation is warranted, Bankers Trust's motion for summary judgment must be denied.